ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2018-Jul-25 14:31:23
23CV-18-1102
C20D01 : 119 Pages

## IN THE COURT OF FAULKNER COUNTY ARKANSAS

**WILLIAM F. DOSHIER;**
**and dotStrategy, Co.**                                **PLAINTIFFS**

**VS.**                    **NO._____**

**TWITTER, INC.**                                        **DEFENDANT**

## CLASS ACTION COMPLAINT

### JURY TRIAL DEMANDED

Plaintiff William F. Doshier, hereinafter referred to as DOSHIER, on

behalf of himself and dotStrategy, Co., hereinafter referred to as

DOTSTRATEGY, and all others similarly situated, alleges the following

against Defendant TWITTER, INC., hereinafter referred to as TWITTER,

based on personal knowledge as to Plaintiff and Plaintiff's own acts and on

information and belief as to all other matters based upon, inter alia, the

investigation conducted by and through Plaintiff's undersigned counsel:

### SUMMARY OF THE CASE

1.     TWITTER is an online news and social networking service on which

       users post and interact with messages known as "tweets."

2.     According to TWITTER, "Twitter is what's happening in the world and

       what people are talking about right now."

1

3.    What people in the print media are talking about right now is that
      TWITTER has a fake account problem.

4.    A recent Washington Post article states, "Twitter suspended more
      than 70 million accounts in May and June, and the pace has continued
      in July..." Craig Timberg and Elizabeth Dwoskin, Washington Post: The
      Switch (July 6, 2018), *Twitter is sweeping out fake accounts like
      never before, putting user growth at risk,*
      https://www.washingtonpost.com/technology/2018/07/06/
      twitter-is-sweeping-out-fake-accounts-like-never-before-putting-user-gr
      owth-risk/?utm_term=.bde98b67148b.

5.    A recent article from The Hill states, "Twitter suspended at least 58
      million accounts in the last quarter of 2017 according to numbers
      reviewed by the Associated Press. The new figure comes after the
      company confirmed that it separately booted another 70 million fake
      accounts from its platform between May and June." Ali Breland, The
      Hill (July 17, 2018), *Twitter suspended 58 million accounts last
      quarter of 2017*, http://thehill.com/policy/technology/
      397494-twitter-suspended-58-million-
      accounts-in-last-quarter-of-2017.

6.    A recent N.Y. Times article states the following:

The real Jessica Rychly is a Minnesota teenager with a broad smile and wavy hair... But on Twitter, there is a version of Jessica that none of her friends or family would recognize... All these [FAKE TWITTER] accounts belong to customers of an obscure American company named Devumi that has collected millions of dollars in a shadowy global marketplace for social media fraud. Devumi sells Twitter followers and retweets to celebrities, businesses and anyone who wants to appear more popular or exert influence online. Drawing on an estimated stock of at least 3.5 million automated accounts, each sold many times over, the company has provided customers with more than 200 million [FAKE] Twitter followers, a New York Times investigation found. The [FAKE] accounts that most resemble real people, like Ms. Rychly, reveal a kind of large-scale social identity theft. At least 55,000 of the [FAKE] accounts use the names, profile pictures, hometowns and other personal details of real Twitter users, including minors, according to a Times data analysis.

Nicholas Confessore, Gabriel J.X. Dance, Richard Harris, and Mark

Hansen, N.Y. Times (January 27, 2018), The Follower Factory,

https://www.nytimes.com/interactive/2018/01/27/technology/social-m

edia-bots.html

7.   Due to articles such as those mentioned above, DOSHIER has recently

become aware of the rampant fake account problem plaguing

TWITTER.

8.   According to the articles mentioned above, TWITTER has suspended a

total of 128 million fake accounts, since they began doing so in the

last quarter of 2017.

3

9.  TWITTER knows, and has known that it has, and has had, a rampant fake account problem.

10. "Bots, trolls and fake accounts are nearly as old as Twitter, which started operations in 2006. In 2015, Twitter's then-chief executive Dick Costolo acknowledged the problem in a company memo: 'We suck at dealing with abuse and trolls [AND FAKE ACCOUNTS] on the platform and we've sucked at it for years.'" Timberg and Dwoskin, *supra*.

11. TWITTER's internal documents will reveal the extent of their marketing fraud.

12. "Leslie Miley, an engineer who worked on security and user safety at Twitter before leaving in late 2015, said, 'Twitter as a social network was designed with almost no accountability.'" Confessore, *supra*.

13. There is no accountability at TWITTER to Self-serve Advertisers, such as DOSHIER and Class members.

14. Another N.Y. Times article states the following:

Twitter said on Thursday that it had overstated its monthly-user figures since 2014 after mistakenly including data from third-party applications in its counting... The company said it had discovered that its measure of monthly active users had been improperly including figures from third-party applications that used Digits, a software-development program. Digits is part of the Fabric mobile application platform that Twitter sold to Alphabet, Google's parent

4

company, this year. Digits allowed third-party applications to send authentication messages through Twitter's systems and did not reflect activity on the Twitter platform, the company said. As a result, the company lowered the number of monthly active users by two million for the first and second quarters of this year and by one million for the fourth quarter of 2016. Twitter said its data-retention policies made it unable to reconcile the figures for periods before last year's fourth quarter.

Chad Bray, N.Y. Times (October 26, 2017), *Twitter Says It Overstated*

*Monthly-User Figures for 3 Years*,

https://www.nytimes.com/2017/10/

26/technology/twitter-q3-earnings-trolls.html.

15. Due to TWITTER's data retention policies, there is no accountability to Self-Serve Advertisers, such as DOSHIER and Class members.

16. Self-Serve Advertisers are not obligated to pay for fake Engagements.

17. TWITTER represents that Self-Serve Advertisers "Only pay when [REAL] users follow your account or retweet, like, reply, or click on your Promoted Tweet."

18. TWITTER defines an Engagement for a Promoted Tweet as follows: "The number of clicks, retweets, likes, follows and replies on a Promoted Tweet."

5

19. TWITTER defines an Impression for a Promoted Tweet as follows: "The number of users who see a Promoted Tweet either in their Home timeline or search results."

20. On behalf of himself and Class members, DOSHIER has filed this class action to ask the court to hold TWITTER accountable for the direct damages that TWITTER has inflicted upon them by charging them for fake Engagements.

21. An Engagement that is generated through a fake TWITTER account is a fake Engagement.

22. Plaintiff and Class members have been charged for fake Engagements, such as for "Website clicks or conversions" (Ad Clicks) generated through fake TWITTER accounts, for "clicks on Promoted Tweets" (Ad Clicks) generated through fake Twitter accounts, and for Follows generated through fake TWITTER accounts.

23. On behalf of himself and Class members, DOSHIER has also filed this class action to ask the court to hold TWITTER accountable for the unjust enrichment of TWITTER. TWITTER has been unjustly enriched as a result of TWITTER having created both an artificial market and fake demand for ads placed on its website. TWITTER allows fake accounts to be created on the TWITTER platform and then allows fake

6

TWITTER accounts to perpetuate on the TWITTER platform. Such activity has resulted in fake Impressions, which have allowed TWITTER to profit at the expense of DOSHIER and Class members.

24. An Impression that is generated through a fake TWITTER account is a fake Impression.

25. TWITTER has inflated and continues to inflate the price to advertise on the TWITTER platform as a result of fake Impressions, either out of its unwillingness or inability to stem the proliferation of fake TWITTER accounts.

26. "Some executives initially were reluctant to act aggressively against suspected fake accounts... In November, one frustrated engineer sought to illustrate the severity of the problem by buying thousands of fake followers for a Twitter manager, said two people familiar with the episode. Bots can be readily purchased on a gray market of websites." Timberg and Dwoskin, *supra*.

27. "These fake [TWITTER] accounts borrowed social identities from Twitter users in every American state and dozens of countries, from adults and minors alike, from highly active users and those who hadn't logged in to their accounts for months or years." Confessore, *supra*.

7

28. "Twitter had said in several public statements this year that it was targeting suspicious accounts, including in a recent blog post that nearly 10 million accounts a week were being "challenged" - a step that attempts to ascertain the authenticity of an account's ownership and requires users to respond to a prompt such as verifying a phone or email address." Timberg and Dwoskin, *supra*.

29. The abovementioned process whereby accounts are being "challenged" by TWITTER to ascertain the authenticity of the accounts is something that TWITTER could have been doing a long time ago, but they chose not to, as it would have impacted its advertising revenue.

30. Although it is a labor intensive and time-consuming process, policing the TWITTER platform through the abovementioned account challenging process is straightforward and simple. Yet, TWITTER failed to implement policies, such as the account challenging process, until only recently, which has resulted in direct damages to Self-Serve Advertisers.

31. "In May, Twitter announced major changes to the algorithms it uses to police bad behavior." Timberg and Dwoskin, *supra*.

32. TWITTER could have made changes to its algorithms a long time ago, but chose not to, as it would have impacted its advertising revenue.

8

33. "[R]esearchers have for years complained that the [fake account] problem is far more serious and that Twitter's definition of a fake account is too narrow, allowing them to keep counts low. Several independent projects also have followed particular bots and fake accounts over many years, and even after the recent crackdown, researchers point to accounts with obviously suspicious behaviors, such as gaining thousands of followers in just a few days or tweeting around the clock. 'When you have an account tweeting over a thousand times a day, there's no question that it's a bot,' said Samuel C. Woolley, research director of the Digital Intelligence Lab at the Institute for the Future, a Palo Alto, Calif.-based think tank." Timberg and Dwoskin, *supra*.

34. TWITTER has willfully underestimated its fake account problem.

35. TWITTER has willfully allowed fake TWITTER accounts to be created and perpetuated on its platform.

36. By allowing fake accounts to generate fake traffic, TWITTER artificially inflates the actual amount of genuine traffic on its social network, thus creating an artificial market, or fake demand that they then market to Self-Serve advertisers such as DOSHIER and Class members.

9

37.   TWITTER unequivocally represents that ads, or Promoted Tweets, are marketed to real people, or real TWITTER users with real TWITTER accounts, (i.e. real Impressions by real people, not fake people, or fake TWITTER users with fake TWITTER accounts). Simply put, an Impression is an exposure of an ad, or Promoted Tweet to a real person.

38.   TWITTER's "Advertise on Twitter" page can be found at the following link: https://ads.twitter.com.

39.   TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will help you "Reach potential customers" and "Get your messages in front of [REAL] people not yet following you by promoting your Tweets."

40.   TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will help you "Gain more followers" and "Quickly grow your community of high value [REAL] followers and drive word of mouth by promoting your account"

41.    TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will allow you to "Choose your target audience" and "Reach the right audience by targeting based on interests, geography, gender, device, or users similar to your [REAL]

followers. In addition, maximize the relevancy of your message by targeting by keywords in [REAL] people's Tweets."

42. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will allow you to "Amplify your message and get discovered" and "Get your Tweets and your account in front of more [REAL] people who are interested in you."

43. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will allow you to "Set a budget and pay for what works" and "Only pay when [REAL] users follow your account or retweet, like, reply, or click on your Promoted Tweet. You're in complete control. There's no minimum spend, and you can start and stop at any time."

44. DOSHIER and Class members relied upon TWITTER's representations that their ads or Promoted Tweets would be marketed to real people with real TWITTER accounts, not fake people with fake Twitter accounts.

45. DOSHIER and Class members relied upon TWITTER's representations as to the benefits of advertising on the TWITTER platform.

46. By allowing fake accounts to generate fake TWITTER activity or traffic, TWITTER overestimates or inflates the actual amount of traffic on its

social network, thereby enticing Self-Serve Advertisers to place ads, or Promote Tweets, on the TWITTER platform.

47.  Inflated TWITTER traffic from fake TWITTER accounts allows TWITTER to charge more for its advertising, which directly results in inflated billings to Self-Serve Advertisers, such as DOSHIER and Class members.

48.  Over the time frame of October 2013 through December 2016, DOSHIER placed 34 ads in two Twitter accounts and was billed $2,220.76; 11 ads ran in a Twitter account handle @buzznames, 23 ads ran in a Twitter account handle @dotstrategy. All ads were placed for the promotion of the .buzz domain name registry.

49.  Billing from TWITTER is based on a stated activity goal, such as creating new Follows, or generating ad clicks from TWITTER accounts in response to the placed ads placed by Self-Serve Advertisers, such as DOSHIER and Class members.

50.  A TWITTER ad placed by DOSHIER in the @dotstrategy account on December 3, 2016 generated 166,207 Impressions and 131 Ad Clicks with a total cost of $475.35 or approximately $3.63 per Click. Another way of looking at this is that the ad cost DOSHIER approximately $.0025 per Impression.

12

51. Of the 131 ad clicks that DOSHIER was directly billed for by TWITTER for the ad he placed for the @dotstrategy account on December 3, 2016, DOSHIER suspects that a significant number of the ad clicks are from fake TWITTER accounts, but without transparency and accountability from TWITTER, the actual number of ad clicks, or percentage of the 131 ad clicks, that were generated by fake TWITTER accounts in the 131 ad clicks that DOSHIER was charged for by TWITTER will remain unknown.

52. Of the 166,207 Impressions that were generated from the TWITTER ad placed by DOSHIER for the @dotstrategy account on December 3, 2016, DOSHIER suspects that a significant number of the impressions are from fake TWITTER accounts, but without transparency and accountability from TWITTER, the actual number of Impressions, or percentage of 166,207 Impressions, that were generated by fake TWITTER accounts in the 166,207 total will remain unknown.

53. Without transparency and accountability, the 166,207 Impressions and 131 Ad Clicks for the ad placed by DOSHIER, for the @dotstrategy account, on December 3, 2016, are nothing more than worthless analytics, which DOSHIER purchased directly from TWITTER for a total cost of $475.35.

54.   A TWITTER ad placed by DOSHIER in the @buzznames account on
October 1, 2015 generated 6,226 impressions and 14 Follows with a
total cost of $51.05 or approximately $3.65 per Follow. Another way
of looking at this is that the ad cost DOSHIER approximately $.0082
per Impression.

55.   Of the 14 Follows that DOSHIER was directly billed for by TWITTER
for the ad he placed for the @buzznames account on October 1, 2015,
DOSHIER suspects that a significant number of the Follows are from
fake TWITTER accounts, but without transparency and accountability
from TWITTER, the actual number of Follows, or percentage of the 14
Follows, that were generated by fake TWITTER accounts, for the 14
Follows that DOSHIER was charged for by TWITTER, will remain
unknown.

56.   Of the 6,226 impressions that were generated from the TWITTER ad
placed by DOSHIER for the @buzznames account on October 1, 2015,
DOSHIER suspects that a significant number of the impressions are
from fake TWITTER accounts, but without transparency and
accountability from TWITTER, the actual number of Impressions, or
percentage of the 6,626 Impressions, that were generated by fake
TWITTER accounts total will remain unknown.

57. Without transparency and accountability, the 6,226 Impressions and 14 Follows for the ad placed by DOSHIER, for the @buzznames account on October 1, 2015, are nothing more than worthless analytics, which DOSHIER purchased directly from TWITTER for a total cost of $51.05

58. Without transparency and accountability, TWITTER's Impressions and Engagements, which TWITTER markets to Self-Serve Advertisers, such as DOSHIER and Class members, are nothing more than worthless analytics.

59. TWITTER should be estopped from, and held liable for, marketing worthless analytics.

60. TWITTER should be estopped from, and held liable for, selling fake Engagements.

61. TWITTER should be estopped from, and held liable for, marketing fake Impressions.

62. TWITTER should be estopped from, and held liable for, creating an artificial market, or fake demand for ads, or Promoted Tweets, placed on the TWITTER platform.

63. TWITTER should be estopped from, and held liable for, selling fake Follows.

64.   "[Del] Harvey [Twitter's vice president for trust and safety] said the
      company was planning to go further in the year ahead. 'We have to
      keep observing what the newest vectors are, and changing our ways
      to counter those,' she said. 'This doesn't mean we're going to sit on
      our laurels.'" Timberg and Dwoskin, *supra*.

65.   Unfortunately for TWITTER advertisers, such as DOSHIER and Class
      Members, TWITTER has been sitting on its laurels.

66.   TWITTER has, and has had, a rampant fake account problem, which
      they chose to ignore.

67.   DOSHIER has filed this class action lawsuit, on behalf of himself and
      Class members to ask the court to hold TWITTER accountable for the
      direct damages TWITTER has caused them, as well as for the unjust
      enrichment of TWITTER at their expense.

68.   TWITTER's conduct, as alleged herein, violates Ark. Code Ann.
      Sections 4-88-107, 4-75-201, et seq., and 4-75-309, and constitutes
      breach of contract and common law fraud under Arkansas law.

**JURISDICTION AND VENUE**

69.   The Circuit Court of Faulkner County, Arkansas, has jurisdiction of this
      case because of the fact the Plaintiff and Class members are seeking
      damages against the Defendant in this civil proceeding thereby giving

16

this court jurisdiction under Ar. Const. Art. 7, Sec. 11 and Ark. Code Ann. Sec. 16-13-201.

70. The venue for this action is in Faulkner County, Arkansas, pursuant to the provisions of Ark. Code Ann. Sec 16-60-113 and the fact that some or all of the misrepresentations occurred in Faulkner County, Arkansas, and, therefore, venue is proper. *See Evans Industrial Coatings, Inc. v. Chancery Court of Union County*, 315 Ark. 728, 870 S.W.2d 701 (1994).

71. Plaintiffs assert no federal question and/or violations of federal law.

72. Plaintiff and Class members seek monetary damages of all types, including but not limited to, compensatory and punitive damages, and attorneys' fees, as well as any other monetary damages the court deems appropriate as enumerated in the Prayer for relief, such as treble damages.

## **PARTIES**

73. Plaintiff DOSHIER is a citizen and resident of Arkansas. DOSHIER has a TWITTER account. DOSHIER is an entrepreneur, educator, and small business owner. DOSHIER owns numerous digital properties. DOSHIER owns the top level domain ".buzz." DOSHIER advertises on TWITTER on behalf of dotStrategy, Co., to promote the top level domain

17

".buzz," as well as to promote various domain and digital properties affiliated with the top level domain ".buzz," that he owns. DOSHIER receives bills from TWITTER for ads that he has placed on behalf of dotStrategy, Co., and the various domain and digital properties affiliated with the top level domain ".buzz," at his home business at 1920 Centennial Club Dr., Conway, AR 72034.

74.   Plaintiff dotStrategy, Co., is an Arkansas for Profit Corporation. The business address of dotStrategy, Co., is 1920 Centennial Club Dr., Conway, AR 72034.

75.   Defendant TWITTER is incorporated in Delaware, and the Company's principal executive offices are located at 1355 Market Street, Suite 900, San Francisco, CA 94103. TWITTER's securities trade on the NYSE under the ticker symbol "TWTR." TWITTER may be served with process by serving its registered agent, Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, DE 19901.

## FACTUAL BACKGROUND

76.   TWITTER operates a social networking website or community that allows people to communicate and/or connect with their family, friends, and other TWITTER users through the sharing of information, photographs, videos, and website links, as well as through the posting

18

of advertisements on TWITTER's social networking website or community.

77. "Twitter said on Thursday that it had overstated its monthly-user figures since 2014...Twitter said its data-retention policies made it unable to reconcile the figures for periods before last year's [2016] fourth quarter." Bray, *supra*.

78. TWITTER has a history of a lack of accountability.

79. TWITTER should be estopped from being able to hide behind self-serving data retention policies in their defense of this matter.

80. If TWITTER is unable to prove that the Engagements for which DOSHIER and Class members have been charged by TWITTER came from real people with real TWITTER accounts, DOSHIER requests the court to order TWITTER to reimburse DOSHIER and Class members for 100% of the charges for those Engagements.

81. If TWITTER is unable to prove that the Engagements, such as Ad Clicks and Follows, for which DOSHIER and Class members have been charged by TWITTER came from real people with real TWITTER accounts, DOSHIER requests the court to order TWITTER to reimburse DOSHIER and Class members for 100% of the charges for those Ad Clicks and Follows.

19

82. DOSHIER and Class members had a justifiable expectation that their TWITTER ads would generate real Impressions from real people with real TWITTER accounts.

83. If TWITTER is unable to prove that the Impressions that TWITTER reported for the ads that DOSHIER and Class members have been charged by TWITTER came from real people with real TWITTER accounts, DOSHIER requests the court to order TWITTER to reimburse DOSHIER and Class members for all of the ad revenues that it received from DOSHIER and Class members for those ads, for the unjust enrichment of TWITTER as a result of TWITTER having created an artifcial market and fake demand for Promoted Tweets through fake Impressions.

84. "The extent of account suspensions, which has not previously been reported, is one of several recent moves by Twitter to limit the influence of people it says are abusing its platform. The changes, which were the subject of internal debate, reflect a philosophical shift for Twitter. Its executives long resisted policing misbehavior more aggressively... Del Harvey, Twitter's vice president for trust and safety... added that Twitter only recently was able to dedicate the

resources and develop the technical capabilities to target malicious behavior in this way." Timberg and Dwoskin, *supra*.

85. TWITTER has a market capitalization of over $33 Billion dollars.

86. TWITTER is publicly traded on the NYSE under the symbol TWTR.

87. TWITTER has had the resources to address its fake account problem, but chose not to do so, because it would have had a negative effect on its ad revenue and stock price.

88. "Twitter's increased suspensions also throw into question its estimate that fewer than 5 percent of its active users are fake or involved in spam, and that fewer than 8.5 percent use automation tools that characterize the accounts as bots." Timberg and Dwoskin, *supra*.

89. "Independent researchers and some investors long have criticized the company for not acting more aggressively to address what many considered a rampant problem with bots, trolls and other [FAKE] accounts used to amplify disinformation. Though some go dormant for years at a time, the most active of these accounts tweet hundreds of times a day with the help of automation software..." Timberg and Dwoskin, *supra*.

90. "The decision to forcefully target suspicious accounts followed a pitched battle within Twitter last year over whether to implement new

detection tools. One previously undisclosed effort called "Operation Megaphone" involved quietly buying fake accounts and seeking to detect connections among them, said two people familiar with internal deliberations." Timberg and Dwoskin, *supra*.

91.　"Some executives initially were reluctant to act aggressively against suspected fake accounts... In November, one frustrated engineer sought to illustrate the severity of the problem by buying thousands of fake followers for a Twitter manager, said two people familiar with the episode. Bots can be readily purchased on a gray market of websites." Timberg and Dwoskin, *supra*.

92.　"These fake [TWITTER] accounts borrowed social identities from Twitter users in every American state and dozens of countries, from adults and minors alike, from highly active users and those who hadn't logged in to their accounts for months or years." Confessore, *supra*.

93.　"Twitter had said in several public statements this year that it was targeting suspicious accounts, including in a recent blog post that nearly 10 million accounts a week were being "challenged" - a step that attempts to ascertain the authenticity of an account's ownership and requires users to respond to a prompt such as verifying a phone or email address." Timberg and Dwoskin, *supra*.

94. The abovementioned process whereby accounts are being "challenged" by TWITTER to ascertain the authenticity of the accounts is something that TWITTER could have been doing a long time ago, but they chose not to, as it would have impacted its advertising revenue.

95. There is no accountability at TWITTER to Self-serve Advertisers, such as DOSHIER and Class members.

96. "In May, Twitter announced major changes to the algorithms it uses to police bad behavior." Timberg and Dwoskin, *supra*.

97. TWITTER could have made changes to its algorithms a long time ago, but chose not to, as it would have impacted its advertising revenue.

98. "[R]esearchers have for years complained that the problem is far more serious and that Twitter's definition of a fake account is too narrow, allowing them to keep counts low. Several independent projects also have followed particular bots and fake [TWITTER] accounts over many years, and even after the recent crackdown, researchers point to accounts with obviously suspicious behaviors, such as gaining thousands of followers in just a few days or tweeting around the clock. 'When you have an account tweeting over a thousand times a day, there's no question that it's a bot,' said Samuel C. Woolley, research director of the Digital Intelligence Lab at the Institute for the

Future, a Palo Alto, Calif.-based think tank." Timberg and Dwoskin, *supra*.

99.  TWITTER has willfully underestimated its fake account problem.

100. TWITTER has not fully addressed its fake account problem.

101. By allowing fake accounts to generate fake traffic, TWITTER overestimates or inflates the actual amount of traffic on its social network, thereby enticing Self-Serve Advertisers to place ads, or Promote Tweets, on the TWITTER platform.

102. "Sometimes the company suspends the accounts. But Twitter also limits the reach of certain tweets by placing them lower in the stream of messages, sometimes referred to as 'shadow banning,' because the user may not know they are being demoted. Harvey said the effort built on the technical expertise of an artificial intelligence start-up called Magic Pony that the company acquired in 2016. The acquisition 'laid the groundwork that allowed us to get more aggressive,' Harvey said. 'Before that, we had this blunt hammer of your account is suspended, or it wasn't.'" Timberg and Dwoskin, *supra*.

103. While "shadow banning" fake TWITTER accounts is an effective tool for censorship, the "shadow banning" of fake TWITTER accounts continues to allow TWITTER to report inflated traffic on its social

network, as the shadow banned accounts continue to create TWITTER traffic.

104. By inflating the traffic on its network, TWITTER is able to directly charge more for advertising on the TWITTER platform.

105. Inflated fake TWITTER activity from fake TWITTER accounts results in inflated billings to Self-Serve Advertisers, such as DOSHIER and Class members.

106. Over the time frame of October 2013 through December 2016, DOSHIER placed 34 ads in two Twitter accounts and was billed $2,220.76; 11 ads ran in a Twitter account handle @buzznames, 23 ads ran in a Twitter account handle @dotstrategy. All ads were placed for the promotion of the .buzz domain name registry.

107. DOSHIER placed 34 ads on TWITTER from October 2013 to December 2016.

108. Of the 34 ads that DOSHIER placed on TWITTER there is no data available from TWITTER for 29 of those ads.

109. TWITTER has provided data on only 5 of DOSHIER's ads, and that data is minimal at best.

110. None of the Handles are available for any of the TWITTER accounts which generated the Engagements for which DOSHIER was charged.

111. TWITTER should be estopped from being able to hide behind self-serving data retention policies in their defense of this matter.

112. Billing from TWITTER is based on a stated activity goal, such as creating new Follows, or generating Ad Clicks from TWITTER accounts in response to the ads, or Promoted Tweets, placed by Self-Serve Advertisers, such as DOSHIER and Class members.

113. A TWITTER ad placed by the @dotstrategy account on December 3, 2016, for the stated goal of generating "website clicks or conversions" (Ad Clicks), generated 166,207 Impressions and 131 Ad Clicks with a total cost of $475.35 or approximately $3.63 per Click.

114. Of the 131 Clicks that DOSHIER was billed for by TWITTER for the ad placed by the @dotstrategy account on December 3, 2016, DOSHIER suspects that a significant number of the Clicks were genertated through fake TWITTER accounts.

115. Of the 166,207 Impressions of the TWITTER ad placed by the @dotstrategy account on December 3, 2016, DOSHIER suspects that a significant number of the Impressions were genertated through fake TWITTER accounts.

116. Without transparency and accountability from TWITTER, the 166,207 Impressions and 131 Ad Clicks for the ad placed by the @dotstrategy

account on December 3, 2016 are nothing more than worthless analytics, which DOSHIER purchased directly from TWITTER for a total cost of $475.35.

117. Without transparency and accountability, Ad Clicks and Follows, which TWITTER sells to Self-Serve Advertisers, such as DOSHIER and Class members, are nothing more than worthless analytics.

118. Without transparency and accountability, Impressions, which TWITTER markets to Self-Serve Advertisers as evidence of a substantial market or audience for Promoted Tweets, are nothing more than worthless analytics.

119. "The data obtained by The Post shows a steady flow of suspensions and spikes on particular days, such as Dec. 7, when 1.2 million accounts were suspended, nearly 50 percent higher than the average for that month. There was also a pronounced increase in mid-May, when Twitter suspended more than 13 million in a single week - 60 percent more than the pace in the rest of that month." Timberg and Dwoskin, *supra*

120. TWITTER has a fake account problem.

121. TWITTER should be held accountable for charging DOSHIER and Class members for fake Engagements, such as fake Ad Clicks and fake

27

Follows, which are Ad Clicks and Follows that have been generated

through fake TWITTER accounts.

122. TWITTER should be held accountable for marketing fake Impressions

to Self-Serve Advertisers, in order to entice them to place ads, or

Promoted Tweets on the Twitter platform.

123. TWITTER 's Terms of Service can be found at the following link:

https://twitter.com/en/to

124. TWITTER's Terms of Service has the following Limitation of Liability:

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE
TWITTER ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT,
INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES,
OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED
DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE,
GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i)
YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE
THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD
PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY
DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS
OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE
SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION
OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE
AGGREGATE LIABILITY OF THE TWITTER ENTITIES EXCEED THE
GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE
AMOUNT YOU PAID TWITTER, IF ANY, IN THE PAST SIX MONTHS
FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS
OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY,
WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT
(INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT
THE TWITTER ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY
OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH
HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

125. Although the abovementioned Limitation of Liability seems exhaustive and comprehensive, it fails to limit liability for direct damages caused by TWITTER.

126. The abovementioned Limitation of Liability simply does not apply to direct damages.

127. Please note, the abovementioned Limitation of Liability limits liability for "ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY."

128. The phrase, "WHETHER INCURRED DIRECTLY OR INDIRECTLY" unequivocally qualifies the preceding phrase, "ANY LOSS OF PROFITS OR REVENUES."

129. DOSHIER and Class members are not claiming that they have lost any profits or revenues.

130. DOSHIER and Class members have suffered direct damages due to the fraud and misrepresentations of TWITTER.

131. DOSHIER and Class members have suffered direct damages by being charged for fake ad clicks, and fake Follows by TWITTER.

132. DOSHIER and Class members have suffered direct damages by being charged inflated prices by TWITTER for their ads due to the fact that TWITTER allowed an artificial market, or fake demand for ads, or

Promoted Tweets, to be created and then perpetuated on the TWITTER platform through fake Impressions from fake Twitter accounts.

133. TWITTER's Terms of Service states, "You may use the Services only if you agree to form a binding contract with Twitter…"

134. DOSHIER and Class members acknowledge they used TWITTER's Services.

135. TWITTER's Terms of Service states, "If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms)."

136. DOSHIER and Class members acknowledge they entered into a binding agreement with TWITTER. However, the terms of the binding agreement, such as the binding term that Self-Serve Advertisers are not obligated to pay for fake Engagements, and "Only pay when [REAL] users follow your account or retweet, like, reply, or click on your Promoted Tweet," is not defined anywhere in the Twitter Master Services Agreement. The terms of the binding agreement can only be found in the representations of TWITTER on its website. The terms of the agreement are questions of fact for the trier of fact.

137. The Twitter Master Services Agreement simply states, "The [Twitter

Master Services] Agreement constitutes the entire agreement and

understanding between you and us regarding the subject matter

contained herein and supersedes all proposals, representations, claims,

and communications in all forms of media (including all instructions,

advertisements, messages, and policies), written and oral, regarding

the subject matter contained herein…"

138. The Twitter Master Services Agreement is an attempt by TWITTER to

limit its liability.

139. The Twitter Master Services Agreement has the following limitation of

Liability clause:

LIMITATION OF LIABILITY. EXCEPT FOR (i) CONFIDENTIALITY
OBLIGATIONS SET FORTH IN SECTION 6 ABOVE, (ii) YOUR
INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 8 ABOVE,
AND (iii) AMOUNTS DUE AND PAYABLE BY YOU HEREUNDER, TO
THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ANY
LIABILITY OF THE TWITTER ENTITIES AND YOU IN CONNECTION
WITH THE AGREEMENT, UNDER ANY CAUSE OF ACTION OR
THEORY, WHETHER IN CONTRACT OR TORT, INCLUDING
NEGLIGENCE OR OTHERWISE, WILL BE STRICTLY LIMITED TO THE
LESSER OF THE AMOUNT ALREADY PAID BY YOU TO US PURSUANT
TO THE AGREEMENT IN THE SIX-MONTH PERIOD PRIOR TO THE
EVENT GIVING RISE TO THE CLAIM OR U.S. $250,000 (OR ITS
EQUIVALENT IN THE APPLICABLE CURRENCY). IN NO EVENT WILL
THE TWITTER ENTITIES OR YOU BE LIABLE FOR COSTS OF
PROCUREMENT OF SUBSTITUTE PRODUCTS OR SERVICES, LOST
PROFITS, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL,
CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING

OUT OF, OR IN CONNECTION WITH, THE AGREEMENT. YOU WILL NOT HOLD A TWITTER COMPANY RESPONSIBLE FOR THE SELECTION OR RETENTION OF, OR ANY ACTS, ERRORS, OR OMISSIONS BY, ANY THIRD PARTY IN CONNECTION WITH THE AGREEMENT, INCLUDING WITH RESPECT TO ACTIONS BY ANY THIRD PARTY RELATING TO OR IN CONNECTION WITH YOUR ADS, REGARDLESS OF THE INTENT OF SUCH THIRD PARTY.

140. There are multiple events that give rise to the claims in this matter, as there are multiple Class members, each with at least one or more ads. The events giving rise to TWITTER's liability in this matter are the same across the Class. Each and every Engagement for which DOSHIER and Class members have been charged by TWITTER is its own stand alone event giving rise to the claims in this matter.

141. Hence, each ad, or Promoted Tweet, in which DOSHIER and Class members were charged by TWITTER for fake engagements, will also be its own stand alone event giving rise to the claim for that specific ad, as TWITTER invoiced DOSHIER and Class members for the total cost of each specific ad.

142. Hence, there are significant measurable damages in this matter.

143. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will provide "Solutions to help you achieve your business goals."

144. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will help you "Reach potential customers" and "Get your messages in front of people [REAL IMPRESSIONS from REAL PEOPLE] not yet following you by promoting your Tweets.

145. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will help you "Gain more followers" and "Quickly grow your community of high value [REAL] followers and drive word of mouth by promoting your account."

146. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will help you "Measure results in real time" and "Track the growth of your [REAL] follower base and see how people engage [REAL [ENGAGEMENTS from REAL PEOPLE] with every single Tweet"

147. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will allow you to "Choose your target audience" and "Reach the right audience by targeting based on interests, geography, gender, device, or users similar to your [REAL] followers. In addition, maximize the relevancy of your message by targeting by keywords in [REAL] people's Tweets."

148. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will allow you to "Amplify your message and get discovered" and "Get your Tweets and your account in front of more people [REAL IMPRESSIONS from REAL PEOPLE] who are interested in you."

149. For the reasons stated above, DOSHIER and Class members advertised on TWITTER.

150. TWITTER represents on its "Advertise on Twitter" page that advertising on TWITTER will allow you to "Set a budget and pay for what works" and "Only pay when [REAL] users follow your account or retweet, like, reply, or click on your Promoted Tweet [REAL ENGAGEMENTS]. You're in complete control. There's no minimum spend, and you can start and stop at any time."

151. TWITTER defines an Engagement for a Promoted Tweet as follows: "The number of clicks, retweets, likes, follows and replies on a Promoted Tweet."

152. Advertisers are not obligated to pay for fake Engagements.

153. DOSHIER and Class members have been charged for fake Engagements by TWITTER.

154. TWITTER acknowledges in their "About fake engagements" page that fake Engagements, such as fake Follows, do indeed exist on the TWITTER platform.

155. TWITTER's "About fake engagements on Twitter" page can be found at the following:

https://help.twitter.com/en/safety-and-security/fake-twitter-followers-a

nd-interactions

156. TWITTER's "About fake engagements on Twitter" page states the following:

About fake engagements on Twitter

Can I purchase or sell account interactions (i.e. Twitter followers, Retweets or likes) on Twitter?

No. Twitter strictly prohibits the purchasing and selling of account interactions on our platform. When you purchase followers, Retweets and likes, you are often purchasing bot (fake) or hacked accounts. Any account caught participating in this behavior will be in violation of the Twitter Rules and may be suspended.

- If your account is found to have purchased followers, Retweets and likes, your account may be suspended.
- If your account is promoting the selling of followers, Retweets and likes, your account may be suspended.
- If your account is set up with the sole purpose of selling followers, Retweets and likes, your account may be suspended.

157. TWITTER defines a Promoted Tweet as follows: "Promoted Tweets are ordinary Tweets purchased by advertisers who want to reach a wider

group of users or to spark engagement from their existing followers. All Promoted Tweets are clearly labeled as Promoted when an advertiser is paying for their placement on Twitter. In every other respect, Promoted Tweets act just like regular Tweets and can be retweeted, replied to, liked, and more."

158. TWITTER defines Clicks for Promoted Tweets as follows: "The number of clicks on the Promoted Tweet. Includes clicks on the URL [get.buzz] (shortened or regular links), profile pic, screen name, username, detail, hashtags and faves."

159. TWITTER defines the verb Retweet as follows: "The act of forwarding another user's Tweet to all of your followers."

160. TWITTER defines Replies as follows: "A Tweet in response to another user's message, usually posted by clicking the reply button next to their Tweet in your timeline. A reply always begins with @username."

161. TWITTER does not provide a definition of a "Like." But a "Like" on Twitter is a tool by which TWITTER users are allowed to show their support for specific Tweets without having to make a written comment; (i.e. Twitter users click on the "Like Heart.")

162. TWITTER defines Follow as follows: "To follow someone on Twitter means to subscribe to their Tweets or updates on the site. Find out more about following."

163. TWITTER's "Twitter Ads Glossary" can be found through the "Twitter Ads Help Center" or simply at the following link: https://business.twitter.com/en/help/overview/twitter-ads-glossary.html

164. Advertisers are only required to pay for Engagements.

165. Yet, when advertisers are presented with the Tweet activity regarding a specific Tweet, Twitter provides them with a "Promote your Tweet" marketing ad from TWITTER for that specific Tweet, which not only includes potential Engagements, but also potential Impressions.

166. The "Promote your Tweet" ad states, "Get more impressions on this Tweet!".

167. The Tweet Activity for a specific Tweet that DOSHIER had tweeted in his @dotstrategy account; "Thanks for the mug @wcfay. A busy day comes to an end #wcfay pic.twitter.comOIBmmjPKF7 [Picture of mug]," revealed that he had received 449 Impressions, and 19 Engagements in response to this Tweet.

168. The "Promote your Tweet" ad from TWITTER to DOSHIER for the

abovementioned Tweet states the following:

Promote your Tweet
Get more Impressions on this Tweet!
449 Total Impressions - 19 Total Engagements

Targeting
Select the location you would like to target with this Tweet
Location United States

Budget
Select how much you would like to spend.
$500

Your estimated Reach: 180K Impressions - 558 Engagements

169. TWITTER unequivocally markets Impressions to Self-Serve Advertisers

like DOSHIER and Class members. In the abovementioned marketing

proposal by TWITTER to DOSHIER for him to "Promote your Tweet."

TWITTER represented that the Promoted Tweet would result in

180,000 real Impressions.

170. To Self-Serve Advertisers like DOSHIER and Class members,

Impressions on the TWITTER platform can be just as important as

Engagements, as advertisers want exposure of their products.

TWITTER understands this, which is why they market Impressions of

Promoted Tweets.

171. Impressions are unequivocally an important metric used by TWITTER to sell ads to advertisers, such as DOSHIER and Class members.

172. TWITTER defines an Impression for a Promoted Tweet as follows: "The number of users who see a Promoted Tweet either in their Home timeline or search results."

173. The number of real TWITTER users who will potentially see a Promoted Tweet, real Impressions, is important to a Self-Serve Advertiser, such as Doshier and Class members.

174. The number of fake TWITTER users who will potentially see a Promoted Tweet, fake Impressions, is not important to a Self-Serve Advertiser, such as Doshier and Class members.

175. TWITTER defines Click thru Rate (CTR) as "Total engagements on an ad divided by Impressions."

176. TWITTER defines Follow Rate as follows: "The number of users who start following your Promoted Account compared to the number of Impressions."

177. An article published by Business Insider states the following:

Twitter announced on Wednesday that this week it would no longer include "locked" accounts in users' follower numbers in an attempt to restore faith in those counts.

In a blog post, Twitter said that most people would see a drop of about four followers but that those with larger follower numbers could "experience a more significant drop."

A spokesman told Business Insider the changes would affect tens of millions of accounts, representing about 6% of all follows.
For celebrity Twitter users with huge followings, like Katy Perry (110 million followers)... and Donald Trump (53 million), this could mean a sizeable culling of their follower counts.
Twitter says it locks an account if it detects sudden changes in behaviour, such as tweeting lots of unsolicited replies or mentions, posting misleading links, or being blocked by numerous accounts after mentioning them.

Once an account is locked, it cannot tweet, like, or retweet, and it does not see ads. This isn't the same as deletion, and Twitter often will unlock an account after a set period or once it has verified the account owner.

Twitter said locked accounts tend to have been created by real people, rather than bots. The company added that the crackdown would not affect its monthly-active-user counts.

The company has also been trying to hone in on suspicious accounts over the past two months. Its share price dropped more than 8% on Monday, as investors fear the purge could hurt Twitter's growth metrics.

Isobel Asher Hamilton, The Business Insider (July 12, 2018), *Celebrities are*

*probably about to see a big dip in their Twitter followers - here's why*,

https://www.businessinsider.in/celebrities-are-probably-about-to-see-a-big-dip

-in-their-twitter-followers-heres-why/articleshow/64960679.cms.

178. "Twitter said that most people would see a drop of about four followers but that those with larger follower numbers could "experience a more significant drop." Hamilton, *supra*.

179. According to Social Blade, Katy Perry (110 million followers) lost 2,816,619 Twitter Followers on July 13, 2018.

180. As of July 20, 2018 (28 Day Summary), DOSHIER lost 480 Followers in his @buzznnames TWITTER account (now 2337 Followers).

181. A TWITTER ad placed by DOSHIER in the @buzznames account on October 1, 2015 generated 6,226 impressions and 14 Follows with a total cost of $51.05 or approximately $3.65 per Follow. Another way of looking at this is that the ad cost DOSHIER approximately $.0082 per Impression.

182. Of the 14 Follows that DOSHIER was directly billed for by TWITTER for the ad he placed for the @buzznames account on October 1, 2015, DOSHIER suspects that a significant number of the Follows were generated through from fake TWITTER accounts.

183. Of the 6,226 impressions that were generated from the TWITTER ad placed by DOSHIER for the @buzznames account on October 1, 2015, DOSHIER suspects that a significant number of the impressions were generated through fake TWITTER accounts.

184. DOSHIER suspects that the 480 Followers that he lost as of July 20, 2018 (28 Day Summary), are a result of the recent suspension of fake accounts by TWITTER, including but not limited to the recent change by TWITTER that it would "no longer include 'locked' accounts in users' follower numbers in an attempt to restore faith in those counts."

185. DOSHIER suspects that of the 480 Followers that he lost as of July 20, 2018 (28 Day Summary), a significant number of them were fake TWITTER accounts.

186. DOSHIER also suspects that of the 2,816,619 Followers that Katy Perry lost on July 13, 2018, a significant number of them were also fake TWITTER accounts.

187. According to a Tweet posted on July 11, 2018, by Vijaya Gadde (@vijaya), Legal Counsel for TWITTER, and the Legal, Policy and Trust & Safety Lead @Twitter, "You should be confident that the follower numbers presented across Twitter are meaningful and accurate. We're introducing a change to follower counts as part of our work to make Twitter a more trusted service for public conversation."

188. DOSHIER and Class members are not confident in TWITTER's Follow numbers, ad clicks numbers, or Impressions numbers.

42

189. DOSHIER and Class members are not confident in the transparency or accountability of TWITTER.

190. "Twitter is sweeping out fake accounts like never before, putting user growth at risk." dated July 6, 2018, states, "Twitter suspended more than 70 million accounts in May and June, and the pace has continued in July..." Timberg and Dwoskin, *supra*.

191. "Twitter suspended at least 58 million accounts in the last quarter of 2017 according to numbers reviewed by the Associated Press. The new figure comes after the company confirmed that it separately booted another 70 million fake accounts from its platform between May and June." Breland, *supra*.

192. The "About Suspended Accounts" page can be found at the following link: https://help.twitter.com/en/managing-your-account/ suspended-twitter- accounts.

193. The "About Suspended Accounts" page states, "Most of the accounts we suspend are suspended because they are spammy, or just plain fake... These types of accounts are against our Twitter Rules. Unfortunately, sometimes a real person's account gets suspended by mistake, and in those cases we'll work with the person to make sure the account is unsuspended."

194. For the purposes of this lawsuit, as defined by TWITTER, a fake account is defined as one that is "just plain fake."

195. Please note, TWITTER's statement, "sometimes a real person's account gets suspended by mistake" unequivocally implies that real accounts represent real persons. The corollary of this is that fake accounts represent fake persons. Hence, any account that doesn't represent a real person is a fake account by TWITTER's own definition.

196. Due to a lack of transparency, accountability, and history of self serving policies that it hides behind, such as the self serving data retention policies which "made it unable to reconcile the [Monthly-User] figures for periods before last year's [2016] fourth quarter" (*see* Bray, *supra*), DOSHIER requests that the court place the burden on TWITTER to prove that the Engagements that DOSHIER and Class members have been charged for by TWITTER were indeed generated by real TWITTER accounts and not by fake TWITTER accounts.

197. DOSHIER and Class members relied upon TWITTER's representations that their ads, or Promoted Tweets, would be marketed to real people with real TWITTER accounts, not fake people with fake Twitter accounts.

198. DOSHIER and Class members relied upon TWITTER's representations that their ads, or Promoted Tweets, would "Reach [REAL] potential customers" through real Impressions, not fake Impressions.

199. DOSHIER and Class members relied upon TWITTER's representations that their ads, or Promoted Tweets, would "Gain more [REAL] followers" through real Impressions, exposure to real people with real Twitter accounts, not fake Impressions, exposure to fake people with fake Twitter accounts.

200. TWITTER defines Impressions as "The number of users who see a Promoted Tweet either in their Home timeline or search results."

201. Simply put, an Impression is an exposure of an ad, or Promoted Tweet, to a real TWITTER user, a real person.

202. TWITTER unequivocally represents that Promoted Tweets are marketed to real people, or real TWITTER users with real TWITTER accounts, i.e. real Impressions, not fake people, or fake TWITTER users with fake TWITTER accounts, i.e. fake Impressions.

203. TWITTER defines Serving/Serve as follows: "When you launch a Twitter ads campaign, your ads will appear to users on their home timeline as 'impressions'. A campaign that is gaining impressions is 'serving' or gaining serve."

204. Hence, real Impressions are fundamental to an advertising campaign.

205. TWITTER has consistently advertised on it website that ads placed on the TWITTER platform would be promoted to real people with real Twitter accounts.

206. TWITTER's "Business Solutions" page can be found at the following link: https://business.twitter.com/en/solutions.html

207. TWITTER represents on its "Business Solutions" page that you can "Build your influence, discover new audiences, and strengthen your brand with customized solutions."

208. TWITTER represents on its "Business Solutions" page that it offers "Customized Twitter Ads solutions" that will "help you reach your goals." According to TWITTER, "[w]hether you're launching a product, promoting your brand story, or jumping into discussions about what matters most, Twitter Ads help you reach your goals."

209. TWITTER represents on its "Business Solutions" page that through "Twitter Ads campaigns" you can place "Twitter ads [that] let you build a tailored campaign around your goals, audiences, and budget. With no minimum spend and flexible management options, we give you the power to promote Tweets, drive [GENUINE] traffic to your website, and attract new [GENUINE] account followers."

46

210. TWITTER represents on its "Business Solutions" page that the "Twitter Promote Mode" will "automatically promote Tweets and your account - attracting a larger [GENUINE] audience" for those times "When you don't have the time to manage Twitter Ads but need an always-on promotion solution, look to Twitter Promote Mode. This $99 monthly subscription automatically promotes Tweets and your account - attracting a larger [GENUINE] audience each month."

211. TWITTER's "Business" page an be found at the following link: https://business.twitter.com/

212. TWITTER represents on its "Business" page that "Twitter is where people come to discover what's happening."

213. TWITTER represents on its "Business" page that "Whether you're a CEO strengthening your personal brand, a retailer promoting new products, a mobile app company hoping to get downloads, or just a hustler who wants more followers and likes - Twitter's unique discovery mindset allows businesses and brands to connect with a relevant, engaged audience."

214. TWITTER's "Twitter Ads" page can be found at the following: https://business.twitter.com/en/solutions/twitter-ads.html

215. TWITTER represents on its "Twitter Ads" page that you can "Expand your influence." TWITTER further represents "With Twitter Ads, you can get more likes, amplify your message, and get more people talking about the things that matter to you most — your cause, project, business, or brand."

216. TWITTER represents on its "Twitter Ads" page that you can "Connect with new audiences." TWITTER further represents "People on Twitter are looking for what's new — for great content and stories from the people, businesses, and brands they're interested in. Help them discover you."TWITTER unequivocally represents that ads placed on Twitter, or Promoted Tweets, are marketed to real people.

217. DOSHIER and Class members have relied upon TWITTER's representations that their ads, or Promoted Tweets, would result in real Impressions, real ad clicks, and real Follows, not fake Impressions, fake ad clicks, or fake Follows.

218. TWITTER generates revenue by selling advertising on its social network to Self-Serve Advertisers.

219. TWITTER's Self-Serve Advertisers seek to market their products or digital properties to real people through TWITTER by generating real Follows, real Retweets, real Likes, real Replies, and real Ad Clicks on

48

their ads, or Promoted Tweets, from genuine TWTTER accounts from real people, not from fake people with fake TWITTER accounts on TWITTER's social network.

220. The cost of TWITTER ads generally cost a few dollars per Ad Click, or several dollars per Follow.

221. A TWITTER ad placed by DOSHIER in the @buzznames account on October 1, 2015, resulted in 6226 Impressions and resulted in 14 Follows. The ad cost $51.05 or approximately 3.65 per Follow. Another way of looking at this is that the ad cost approximately $0.0082 per Impression.

222. The complete ad data for the abovementioned ad, or Promoted Tweet, that DOSHIER placed on October 1, 2015 does not appear to be available from TWITTER. Specifically, the Handles of the Follows are not available for the 14 Follows. Without the Handles to the 14 Follows, DOSHIER has no way to review these particular Follows to determine whether they are real Follows, or fake Follows.

223. A TWITTER ad placed by DOSHIER in the @dotstrategy account on December 3, 2016 generated 166,207 Impressions and 131 Clicks with a total cost of $475.35 or approximately $3.63 per Click.

Another way of looking at this is that the ad cost approximately $.0025 per Impression.

224. The complete data for the abovementioned ad, or Promoted Tweet, that DOSHIER placed in the @dotstrategy account on December 3, 2016 does not appear to be available from TWITTER. Specifically, the Handles of the TWITTER accounts that generated the 131 Ad Clicks are not available. Without the Handles of the TWITTER accounts which generated the 131 ad clicks, DOSHIER has no way to review these particular accounts to determine whether they are real Twitter accounts, or fake Twitter accounts.

225. As a matter of fact, none of the data for 29 of the 34 ads that DOSHIER placed on TWITTER from October 2013 through December 2016 is available. This is in keeping with TWITTER's self-serving retention policies. DOSHIER suspects TWITTER has deleted the data to prevent the truth from being discovered that TWITTER has charged Self-Serve advertisers, such as DOSHIER and Class members for fake Impressions, fake ad clicks, and fake Follows, i.e. fake Engagements.

226. To reiterate, none of the Handles data for any of the 34 ads that DOSHIER placed on TWITTER from October 2013 through December 2016 is available. Without the Handle data, it is impossible to know

whether and to what TWITTER charged DOSHIER for fake Follows and fake Ad Clicks.

227. Since TWITTER is responsible for its lack of accountability and transparency, as well as its self-serving data retention policies, DOSHIER asks the court to place the burden on TWITTER to prove whether the Engagements for which DOSHIER and Class members have been charged for are fake or not.

228. If TWITTER is unable to prove whether the Engagements for every ad for which DOSHIER and Class members have been charged for by TWITTER are real, DOSHIER requests that the court order TWITTEER to reimburse DOSHIER and Class members for every ad.

229. Each and every Engagement for which DOSHIER and Class members have been charged by TWITTER is its own stand alone event giving rise to the claims in this matter.

230. If the ad data is no longer available to review, DOSHIER requests the court to order TWITTER to reimburse DOSHIER and Class members for the total amount that they have paid TWITTER for all their ads.

231. Due to TWITTER's lack of accountability and transparency, and rampant fake account problem, which TWITTER has known about, as well as its self-serving data retention policies, DOSHIER asks the court

to assume that every Engagement that DOSHIER and Class members
have been charged for by TWITTER is fake until proven otherwise by
TWITTER.

232. More Follows, Retweets, Likes, Replies, and Clicks on Promoted
Tweets, from TWTTER accounts, whether genuine or fake, on
TWITTER's social network, generates more traffic for the advertisers,
which results in bigger bills for the advertisers, and thus greater
revenue for TWITTER.

233. More TWTTER accounts, whether genuine or fake, on TWITTER's
social network, generates more Impressions for ads, or Promoted
Tweets, which results in the perception of a larger market or audience
for, or a greater demand for, ads or Promoted Tweets placed on the
TWITTER platform, resulting in TWITTER being able to charge more for
the pricing for ads, or Promoted Tweets, placed on the TWITTER
platform, which results in bigger bills for the advertisers, and thus
greater revenue for TWITTER.

234. TWITTER's Self-Serve Advertisers are interested in increasing genuine
traffic from genuine people with genuine TWITTER accounts.

235. TWITTER's Self-Serve Advertisers are interested in increasing genuine
Follows, Retweets, Likes, Replies, and Ad Clicks on Promoted Tweets,

from genuine people with genuine TWTTER accounts, not fake people with fake TWITTER accounts.

236. TWITTER's Self-Serve Advertisers are not obligated to pay for fake Engagements from fake TWITTER accounts.

237. TWITTER's Self-Serve Advertisers are not obligated to pay for fake Follows from fake TWITTER accounts.

238. TWITTER's Self-Serve Advertisers are not obligated to pay for fake Ad Clicks from fake TWITTER accounts.

239. TWITTER has charged DOSHIER and Class members for fake Engagements from fake TWITTER accounts

240. TWITTER has charged DOSHIER and Class members for fake Follows from fake TWITTER accounts

241. TWITTER has charged DOSHIER and Class members for Ad Clicks generated through fake TWITTER accounts.

242. TWITTER has charged DOSHIER and Class members for fake Ad Clicks.

243. TWITTER has artificially inflated the pricing of its advertising due to fake Impressions from fake TWITTER accounts.

244. TWITTER's Self-Serve Advertisers are interested in increasing their product's exposure through genuine Impressions from genuine

TWITTER accounts, not through fake Impressions from fake TWITTER accounts.

245. DOSHIER and Self-Serve advertisers have relied upon TWITTER's representations that their ads or Promoted Tweets would result in genuine exposure to genuine people with genuine TWITTER accounts through genuine Impressions, not through fake Impressions form fake TWITTER accounts.

246. DOSHIER and Self-Serve advertisers have, and have had a reasonable expectation that their ads or Promoted Tweets would result in genuine exposure to genuine people with genuine Twitter accounts through genuine Impressions, not through fake Impressions form fake TWITTER accounts.

247. TWITTER has been unjustly enriched due to fake Impressions from fake TWITTER accounts.

248. Engagements generated through genuine TWITTER accounts are genuine Engagements.

249. Engagements generated through fake TWITTER accounts are fake Engagements.

250. Follows generated through genuine TWITTER accounts are genuine Follows, or genuine Engagements.

251. Follows generated through fake TWITTER accounts are fake Follows, or fake Engagements.

252. Ad Clicks generated through genuine TWITTER accounts are genuine Ad Clicks, or genuine Engagements.

253. Ad Clicks generated through fake TWITTER accounts are fake Ad Clicks, or fake Engagements.

254. TWITTER has suspended a total of 128 million fake accounts since they began doing so in the last quarter of 2017.

255. The "About Suspended Accounts" page states, "Most of the accounts we suspend are suspended because they are spammy, or just plain fake... These types of accounts are against our Twitter Rules. Unfortunately, sometimes a real person's account gets suspended by mistake, and in those cases we'll work with the person to make sure the account is unsuspended."

256. Of the abovementioned 128 million accounts that TWITTER has recently suspended, the overwhelming majority are "just plain fake."

257. Through their actions in recently suspending 128 million fake accounts, TWITTER acknowledges that they can indeed detect and suspend, or delete, fake accounts through the deployment of not only Artificial Intelligence systems, i.e. computer algorithms, assuming they

haven't deleted the data, but also by deploying Genuine Intelligence systems, through the utilization of effective policies and procedures and the deployment of an adequate number of competently trained review staff, to not only detect and prevent the creation of fake accounts on their platform in the first place, but also to detect and suspend, or delete, fake accounts from the TWITTER community, as they have been doing, since they began doing so in the last quarter of 2017.

258. TWITTER can identify, and prevent or inhibit, fake Engagements in the same manner.

259. TWITTER can identify, and prevent or inhibit, fake Follows in the same manner.

260. TWITTER can identify, and prevent or inhibit, fake Ad Clicks in the same manner.

261. TWITTER can identify, and prevent or inhibit, fake Impressions in the same manner.

262. If an Engagement was generated through a fake TWITTER account, then that Engagement is a fake Engagement.

263. If an Impression was generated through a fake TWITTER account, then that Impression is a fake Impression.

264. TWITTER has billed DOSHIER and Class members for fake Engagements.

265. TWITTER overbills, and has overbilled Self-Serve Advertisers for Engagements, Follows, and Ad Clicks, as a result of fake Impressions, which have allowed TWITTER to inflate the pricing of its advertising.

266. TWITTER has market capitalization of $33 Billion.

267. TWITTER's market capitalization has been built on the backs of Self-Serve Advertisers, such as DOSHIER and Class members.

268. DOSHIER owns numerous digital properties, including DOTSTRATEGY.

269. DOSHIER and Class members sought to market their products or digital properties through ads, or Promoted Tweets, on TWITTER.

270. DOSHIER and Class members sought to market their products or digital properties on TWITTER through genuine Engagements, Follows, and Ad Clicks from real people with real TWITTER accounts.

271. DOSHIER and Class members also sought to market their products or digital properties on TWITTER to a genuine audience, through genuine Impressions by real people with real TWITTER accounts.

272. DOSHIER and Class members sought to monetize or increase the value of their products or digital properties through the generation of genuine

Engagements, Follows, Ad Clicks, and Impressions of their ads, or Promoted Tweets, from genuine TWITTER accounts on the TWITTER social network, not fake Engagements or Impressions from fake Twitter accounts.

273. DOSHIER and Class members sought to sell their products or digital properties by increasing genuine traffic to their product specific websites or digital properties, through the generation of genuine Engagements, Follows, Ad Clicks, and Impressions by real TWITTER users, not fake TWITTER users, through the placing of ads, or Promoted Tweets, on the TWITTER social network.

274. As Self-Serve Advertisers, DOSHIER and Class members have purchased ads, or Promoted Tweets, directly from TWITTER.

275. Promoted Tweets are ads that are placed on TWITTER.

276. DOSHIER and Class members have purchased ads, or Promoted Tweets, directly from TWITTER for their products or digital properties in order to increase genuine traffic to their product specific websites or digital properties, through the generation of real Impressions, and/or real Ad Clicks, and/or real Follows, and/or real Engagements through real TWITTER accounts, not through fake TWITTER accounts.

277. DOSHIER and Class members have purchased ads, or Promoted Tweets, directly from TWITTER in order to sell their products or digital properties through real Engagements, such as Ad Clicks generated through real TWITTER accounts, not through fake TWITTER accounts.

278. Fake Twitter accounts do not result in sales for Self-Serve advertisers, but they do result in increased ad revenues for TWITTER.

279. TWITTER misrepresented and continues to misrepresent the actual number of genuine accounts on their social network.

280. DOSHIER and Class members have justifiably relied upon the following repeated misrepresentations by TWITTER and DOSHIER and Class members have formed reasonable expectations that the following are true and accurate:

a. That ads, or Promoted Tweets will be marketed to genuine people with genuine TWITTER accounts, not fake people with fake TWITTER accounts.

b. That ads, or Promoted Tweets, will generate genuine Impressions and Engagements through genuine TWITTER accounts, not fake Impressions and Engagements generated through fake TWITTER accounts.

c.   That ads, or Promoted Tweets, will help you "Connect with new audiences [REAL PEOPLE]."

d.   That if you "Join Twitter Today" you can "Follow your interests," "Hear what [REAL] people are talking about," and "Join the conversation".

e.   That "Twitter is where [REAL] people come to discover what's happening."

f.   That advertising on TWITTER will help you "Reach potential customers" as well as help you to "Get your messages in front of [REAL] people not yet following you by promoting your Tweets."

g.   That advertising on TWITTER will help you "Gain more [GENUINE] followers" as well as help you to "Quickly grow your community of high value [GENUINE] followers and drive word of mouth by promoting your account."

h.   That advertising on TWITTER will help you "Measure results in real time" as well as help you to "Track the growth of your [REAL] follower base and see how [REAL] people engage with every single Tweet."

i.    That advertising on TWITTER will allow you to "Choose your target audience" as well as allow you to "Reach the right audience by targeting based on interests, geography, gender, device, or users similar to your [REAL] followers. In addition, maximize the relevancy of your message by targeting by keywords in [REAL] people's Tweets."

j.    That advertising on TWITTER will allow you to "Amplify your message and get discovered" as well as allow you to "Get your Tweets and your account in front of more people who are interested in you [IMPRESSIONS]."

k.    That advertising on TWITTER will allow you to "Amplify your message and get discovered" through real Impressions by getting "your Tweets and your account in front of more [REAL] people who are interested in you."

l.    That if you advertised with TWITTER you could "Choose your target audience" to "Get your Tweets and your account in front of more [REAL] people who are interested in you [IMPRESSIONS]".

m.    That if you advertised with TWITTER you could "Choose your target audience" to "Gain more [GENUINE] followers".

n.  That if you advertised with TWITTER you would "Gain more [GENUINE] followers", from "[REAL] people who are interested in you."

o.  That only real people use TWITTER.

p.  That if you join the TWITTER community you will be joining a community of real people.

q.  That genuine traffic will be generated for ads, or Promoted Tweets, placed on the TWITTER social network by Self-Serve Advertisers.

r.  That genuine Impressions will be generated for ads, or Promoted Tweets, placed on the TWITTER social network by Self-Serve Advertisers.

s.  That genuine Engagements will be generated for ads, or Promoted Tweets, placed on the TWITTER social network by Self-Serve Advertisers.

t.  That genuine Follows will be generated for ads, or Promoted Tweets, placed on the TWITTER social network by Self-Serve Advertisers.

u.   That genuine Ad Clicks will be generated for ads, or Promoted Tweets, placed on the TWITTER social network by Self-Serve Advertisers.

v.   That the Self-Serve Advertisers would not be charged for Engagements generated through fake TWITTER accounts.

w.   That the Self-Serve Advertisers would not be charged for Follows generated through fake TWITTER accounts.

x.   That the Self-Serve Advertisers would not be charged for Ad Clicks generated through fake TWITTER accounts.

281. TWITTER's Self-Serve Advertisers like DOSHIER and Class members want to connect to real people with genuine TWITTER accounts, not fake people with fake TWITTER accounts.

282. According to TWITTER, "Twitter is what's happening in the world and what [REAL] people are talking about right now."

283. On TWITTER's "Let's go Twitter" page, which can be found at the following link: https://about.twitter.com/en_us/lets-go-twitter.html, TWITTER states, "Getting started is easy. . .Find a bunch of things you love. And then find [REAL] people to follow. That's all you need to do to see and talk about what's happening. Congratulations! You've just mastered Twitter. So let's get started."

284. When opening a TWITTER account the first thing that you are required to provide is your "Name."

285. TWITTER's Self-Serve Advertisers expect to connect with real people on the TWITTER platform.

286. DOSHIER and Class members had a justifiable expectation that TWITTER was TRUSTWORTHY, ACCOUNTABLE, TRANSPARENT, not FAKE.

287. TWITTER has billed DOSHIER and Class members for Engagements, such as Follows and Ad Clicks, for the ads, or Promoted Tweets that DOSHIER and Class members have placed on TWITTER

288. TWITTER has billed DOSHIER and Class members for for fake Engagements, such as Follows and Ad Clicks that were generated through fake TWITTER accounts.

289. TWITTER has overbilled DOSHIER and Class members for the ads, or Promoted Tweets, that DOSHIER and Class members have placed on TWITTER.

290. TWITTER continues to overbill Self-Serve Advertisers by inflating the pricing of its advertising due to the fact that Impressions are not only generated by real TWITTER accounts, but also generated by fake TWITTER accounts.

291. DOSHIER and Class members have suffered damages.

292. TWITTER knew or should have known that it has billed DOSHIER and Class members for fake Engagements, such as Follows and Ad Clicks that were generated through fake TWITTER accounts.

293. TWITTER knew or should have known that it has overbilled DOSHIER and Class members for fake Engagements, such as Follows and Ad Clicks that were generated through fake TWITTER accounts.

294. DOSHIER and Class members have relied upon TWITTER'S representations and have had a justifiable expectation that TWITTER is, and always has been a social media space where real people communicate and interact with each other through messages known as "tweets."

295. Plaintiff reasonably expected, based on TWITTER's own statements, that Plaintiff would only be charged for real Engagements, Follows, and Ad Clicks generated through real TWITTER accounts, not fake Engagements generated through fake TWITTER accounts.

296. Since the date TWITTER began providing advertising services through the present, TWITTER has failed to publicly disclose or adequately disclose information, namely, that fake TWITTER accounts populate the TWITTER platform, and that it does not implement appropriate

policies and procedures to detect and prevent, either by suspension or deletion, said fake TWITTER accounts.

297. Since the date TWITTER began providing advertising services through the present, TWITTER has failed to disclose or adequately publicly disclose information, namely, that it did not have the appropriate measures in place to adequately detect and filter, or eliminate, fake TWITTER accounts and that it does not implement appropriate policies and procedures to avoid billing for fake Engagements.

298. Based on TWITTER's failure to publicly disclose, or failure to adequately publicly disclose, that the TWITTER platform was populated by fake TWITTER accounts, DOSHIER and Class members reasonably expected that they would not be charged for Engagements generated through fake TWITTER accounts.

299. Plaintiff reasonably expected, based on TWITTER's own statements, that Plaintiff would only be charged for real Engagements generated through TWITTER users, not fake Impressions generated through fake TWITTER accounts.

300. TWITTER knew or should have known that it had a rampant fake account problem, but it chose not to inform it's advertisers that it had

such a problem, as that would have substantially decreased its ad revenue.

301. TWITTER either does not have systems in place to protect genuine members of the TWITTER community, such as DOSHIER and CLASS members, or the systems that they do have in place as are grossly inadequate to protect them from fake TWITTER accounts.

302. TWITTER has a contractual duty to only charge for Engagements, such as Follows and Ad Clicks, generated through real TWITTER accounts.

303. TWITTER has a contractual duty to only charge for Engagements generated through real TWITTER accounts.

304. TWITTER has a contractual duty to only market Promoted Tweets to real people with real TWITTER accounts, resulting in real Impressions.

305. DOSHIER has filed this Class Action on behalf of himself and Class members, to notify TWITTER that they have charged DOSHIER and Class members for Engagements, such as Follows and Ad Clicks, generated through fake TWITTER accounts.

306. DOSHIER has filed this Class Action on behalf of himself and Class members, to notify TWITTER that they have marketed DOSHIER's and Class members' Promoted Tweets to fake TWITTER accounts resulting in fake Impressions.

307. DOSHIER has filed this Class Action on behalf of himself and Class members, and is requesting the court to order TWITTER to review all of the TWITTER accounts, including but not limited to the Handles, Profiles, Names, #FirstTweet[s], and Tweet History, of such TWITTER accounts, that generated Impressions and Engagements, such as Follows and Ad Clicks, for all of the ads, or Promoted Tweets, for which DOSHIER has been charged by TWITTER. In this manner, the court can objectively determine the extent to which DOSHIER's ads, or Promoted Tweets, resulted in Impressions and/or Engagements, such as Follows and Ad Clicks, that were generated through fake accounts. Upon a finding that DOSHIER has been charged for fake Engagements, TWITTER should be made to reimburse DOSHIER for those Engagements that were generated through fake TWITTER accounts, as DOSHIER is not obligated to pay for Engagements that have been generated through fake TWITTER accounts.

308. DOSHIER has filed this Class Action on behalf of himself, and Class members, and is requesting the court to order TWITTER to allow DOSHIER as Class Representative to participate in TWITTER's review of DOSHIER's ads, or Promoted Tweets, in order to objectively determine the extent to which DOSHIER's ads, or Promoted Tweets,

resulted in  Impressions and Engagements, such as Follows and Ad Clicks, that were generated through fake accounts. Upon a finding that DOSHIER has been charged for fake Engagements, TWITTER should be made to reimburse DOSHIER for those Engagements that were generated through fake TWITTER accounts, as DOSHIER is not obligated to pay for Engagements that have been generated through fake TWITTER accounts.

309. If the review of DOSHIER's ads, or Promoted Tweets, confirms that he has been charged for fake Engagements, DOSHIER, as class representative, requests the court to order TWITTER to review all of the TWITTER accounts, including but not limited to the Handles, Profiles, Names, #FirstTweet[s], and Tweet History, of such TWITTER accounts that generated Impressions and Engagements, such as Follows and Ad Clicks, for all of the ads, or Promoted Tweets, for which Class members have been charged by TWITTER. In this manner, the court can objectively determine the extent to which Class member's ads, or Promoted Tweets, resulted in Impressions and/or Engagements, such as Follows and Ad Clicks, that were generated through fake accounts. Upon a finding that Class Members have been charged for fake Engagements, TWITTER should be made to reimburse

69

Class members for those Engagements that were generated through fake TWITTER accounts, as Class members are not obligated to pay for Engagements that have been generated through fake TWITTER accounts.

310. The methodology that DOSHIER requests the court to order will not necessarily require an analysis of every single TWITTER ad, or Promoted Tweet, for which DOSHIER and Class members have been charged by TWITTER, as it will become clear that a bell curve of fake TWITTER accounts will be established across the class.

311. The methodology that DOSHIER requests the court to order will not necessarily require an analysis of every single TWITTER account that generated Impressions or Engagements, for every single TWITTER ad, or Promoted Tweet, for which DOSHIER and Class members have been charged by TWITTER, as it will become clear that a bell curve of fake Impressions and fake Engagements will be established across the class.

312. A review of the abovementioned Twitter accounts for fake Impressions, Impressions generated through fake TWITTER accounts, will show the extent to which TWITTER has been unjustly enriched by

allowing fake Twitter accounts to populate and persist on the TWITTER platform.

313. For the purposes of this lawsuit, a fake Engagement is defined as an Engagement generated through a fake TWITTER account.

314. For the purposes of this lawsuit, a fake Follow is defined as a Follow generated through a fake TWITTER account.

315. For the purposes of this lawsuit, a fake Ad Click is defined as an Ad Click generated through a fake TWITTER account.

316. A Follow and an Ad Click are Engagements.

317. For the purposes of this lawsuit, a fake Impression is defined as an Impression generated through a fake TWITTER account.

318. An Impression is not an Engagement.

319. Determining the extent to which fake Impressions are present in the number of Impressions (% of Fake Impressions in Total Impressions) that a Promoted Tweet receives, or can expect to receive, will provide the court with an objective measurement of the extent to which TWITTER inflated the pricing of its Promoted Tweets. This will also provide an objective measurement of the extent of the fraud committed by TWITTER in their marketing of Promoted Tweets, to Self-Serve Advertisers, such as DOSHIER and Class members, as

71

TWITTER represented to them that their Promoted Tweets would be marketed to real people.

320. TWITTER, despite having the software coding capability and access to capital, failed to deploy systems, and/or hire competently trained staff, to detect and prevent fake TWITTER accounts, because the reduction in TWITTER's ad revenue would have been substantial had they suspended and/or deleted the fake TWITTER accounts from the TWITTER platform.

321. TWITTER misrepresented the actual number of real Impressions that a Promoted Tweet could receive or did receive.

322. TWITTER failed to deploy systems to detect and prevent fake TWITTER accounts because of their need to generate more and more ad revenue to satisfy their greed.

323. TWITTER committed widespread fraud across its platform by charging DOSHIER and Class members for fake Engagements.

324. TWITTER committed widespread fraud across its platform by charging DOSHIER and Class members inflated pricing for Promoted Tweets due to the creation of a fake demand, or artificial market or audience, by TWITTER, for Promoted Tweets through fake Impressions.

325. TWITTER's internal documents will reveal the extent of their fraud.

326. TWITTER has chosen to look the other way, as their ad revenues have soared, by failing to implement systems to detect and prevent fake Engagements, and/or fake Follows, and/or fake Ad Clicks and/or fake Impressions on its platform.

327. TWITTER knew of the potential problems with the design of their network, which allowed the prolific creation of fake TWITTER accounts across their community, yet they chose to look the other way.

328. TWITTER knows, and has known, that their community is, and has been, populated by fake TWITTER accounts, and that a significant amount of their ad revenue is generated through fake Engagements.

329. TWITTER knows, and has known, that their community is, and has been, populated by fake TWITTER accounts, and that they can charge more for Promoted Tweets by creating the perception that there is a substantial market or audience for, or demand, for Promoted Tweets through the marketing of fake Impressions.

330. TWITTER should be estopped from attempting to disavow any responsibility and liability for charging DOSHIER and Class members for fake Engagements, such as Follows and Ad Clicks generated through fake accounts, as TWITTER has been unjustly enriched by failing to do

73

anything about its fake account problem despite knowing about for years.

331. TWITTER should be estopped from attempting to disavow any responsibility and liability for creating an artificial market or audience, or fake demand for Promoted Tweets, through fake Impressions, as TWITTER has been unjustly enriched by failing to do anything about its fake account problem despite knowing about for years.

332. DOSHIER became aware of the widespread extent that fake accounts populate the TWITTER platform when TWITTER admitted that they had suspended 128 (58 + 70) million fake accounts since they began suspending accounts in the last quarter of 2017. This is when the statute of limitations began to run. This is when DOSHIER became aware that it was more likely than not that TWITTER had invoiced him for fake Engagements.

333. Invoicing DOSHIER and Class members for fake Engagements is fraudulent and a breach of contract.

334. Each and every fake Engagement for which DOSHIER and Class members have been charged for by TWITTER is its own stand alone event giving rise to the claims in this matter.

335. Each and every fake Engagement for which DOSHIER and Class members have been charged for by TWITTER, is its own act of fraud, and/or breach of contract, and is its own stand alone event giving rise to the claims in this matter.

336. Each and every fake Impression for the ads, or Promoted Tweets, for which DOSHIER and Class members have been charged for by TWITTER, is its own act of fraud, and/or breach of contract, and is its own stand alone event giving rise to the claims in this matter.

337. Furthermore, each ad, or Promoted Tweet, in which DOSHIER and Class members were charged by TWITTER for fake Engagements, will also be its own stand alone event giving rise to the claim for that specific ad, as TWITTER invoiced DOSHIER and Class members for the total cost of that specific ad, which included charges for fake Engagements.

338. Hence, there are significant measurable damages in this matter.

339. DOSHIER has placed 34 ads on TWITTER for DOTSTRATEGY.

340. DOSHIER is unable to perform even a limited manual review of the ads that he placed on TWITTER, as the Handle data for the Twitter accounts that generated the Engagements for which TWITTER charged DOSHIER is no longer available in his TWITTER Ads Manager.

341. As a matter of fact, very little data is available to DOSHIER in his Ads Manager, thus limiting his ability to manually review his advertising account with TWITTER.

342. Due to TWITTER's self-serving data retention policies, TWITTER has not provided transparency or accountability for any of the charges invoiced to DOSHIER for any of the ads, or Promoted Tweets, that he placed on the TWITTER platform, thus limiting his ability to review his account with TWITTER.

343. DOSHIER placed 34 ads on TWITTER from October 2013 to December 2016.

344. Of the 34 ads that DOSHIER placed on TWITTER there is no data available from TWITTER for 29 of those ads.

345. TWITTER has provided data on only 5 of the ads, and that data is minimal at best.

346. None of the Handles are available for any of the TWITTER accounts that generated the Engagements for any of the ads, or Promoted Tweets, for which DOSHIER was charged by TWITTER. Thus, he is not able to review the TWITTER accounts that generated Follows or Ad Clicks for those Promoted Tweets. Thus, he is unable to perform even a limited manual review of those TWITTER accounts which generated

the Engagements to determine whether those Twitter accounts, and thus the Engagements that were genearted through them, are fake or not.

347. With regard to spotting a fake account on TWITTER, the process is simple, but time consuming. But, without a TWITTER user's Handle, such as "@faketwitteraccount," it is impossible to do.

348. DOSHIER has spent a total of $2,220.76 on 34 TWITTER ads.

349. DOSHIER has filed this Class Action on behalf of himself and Class members, to request the court to protect DOSHIER and Class members from TWITTER.

350. A review of the Twitter accounts that generated Impressions of DOSHIER's ads, or Promoted Tweets, for fake Impressions, Impressions generated through fake TWITTER accounts, will show the extent to which TWITTER has been unjustly enriched by allowing fake Twitter accounts to populate and persist on the TWITTER platform.

351. DOSHIER has filed this Class Action on behalf of himself, and Class members, and is requesting the court to order TWITTER to reimburse DOSHIER and Class members for Engagements that are determined to be generated through fake TWITTER accounts.

352. Due to TWITTER's lack of accountability and transparency, and rampant fake account problem, which TWITTER has known about, as well as its self-serving data retention policies, DOSHIER asks the court to assume that every Engagement that DOSHIER and Class members have been charged for by TWITTER is fake until proven otherwise by TWITTER.

353. DOSHIER and Class members had a reasonable expectation that their ads, or Promoted Tweets, would be seen by real people with real TWITTER accounts thus generating real Impressions, not fake Impressions.

354. Although Impressions are not Engagements, DOSHIER has filed this Class Action on behalf of himself, and Class members, and is requesting the court to order TWITTER to set aside a percentage of TWITTER's ad revenues, said percentage to be that percentage of Impressions that are determined to have been generated by fake TWITTER accounts, for DOSHIER and Class members, in order to prevent TWITTER from being unjustly enriched by allowing the widespread proliferation of fake TWITTER accounts on the TWITTER platform, which allowed them to create an artificial market or audience, or fake demand, that DOSHIER and Class members relied

upon to their detriment, as the ads, or Promoted Tweets that they purchased were marketed to fake TWITTER accounts.

355. TWITTER was either negligent or they intentionally committed fraud by allowing the widespread proliferation of fake TWITTER accounts on the TWITTER platform.

356. DOSHIER asks the court to appoint him as Class Representative.

357. DOSHIER asks the court to certify this matter as a Class Action.

358. DOSHIER has a workable methodology for defining with precision the fake Engagements that DOSHIER and Class members are not obligated to pay for, as well as for determining on a class-wide basis whether, and to what extent, putative class members were charged for such Engagements.

359. TWITTER has, or should have, the Handles for each TWITTER account that generated an Engagement for every ad, or Promoted Tweet, that DOSHIER and Class members purchased from TWITTER. By manually reviewing each TWITTER account, including but not limited to the Handles, Profiles, Names, #FirstTweet[s], and Tweet History of said TWITTER accounts, for each TWITTER account that generated an Engagement for every ad, one can determine whether the Engagement was generated through a fake account.

79

360. Engagements generated through fake TWITTER accounts are fake Engagements.

361. DOSHIER and Class members are to be reimbursed for every fake Engagement that TWITTER charged them for.

362. Follows and Ad Clicks are Engagements.

363. DOSHIER has a workable methodology for defining with precision the fake Impressions, Impressions generated through fake TWITTER accounts, through which TWITTER unjustly enriched itself, as well as for determining on a class-wide basis whether, and to what extent, putative class members' ads, or Promoted Tweets, were marketed to such fake TWITTER accounts that the generated the fake Impressions.

364. Impressions generated through fake TWITTER accounts are fake Impressions.

365. TWITTER has, or should have, the Handles for each TWITTER account that generated an Impression for every ad, or Promoted Tweet, that DOSHIER and Class members purchased from TWITTER. By manually reviewing each TWITTER account, including but not limited to the Handles, Profiles, Names, #FirstTweet[s], and Tweet History of said TWITTER accounts, for each TWITTER account that generated an

Impression for every ad, one can determine whether the Impression was generated through a fake account.

366. DOSHIER and Class members are not obligated to pay for Engagements, such as Follows or Ad Clicks, generated through fake TWITTER accounts.

367. The issues to be determined in this matter are whether and to what extent DOSHIER and Class members have been charged for Engagements generated through fake Twitter accounts, and whether and to what extent TWITTER has been unjustly enriched by marketing ads, or Promoted Tweets, to fake TWITTER accounts, which result in fake Impressions, which allow, and have allowed TWITTER to profit at the expense of DOSHIER and Class members.

368. The methodology to determine whether Engagements were generated through fake accounts, which is the issue in this matter, is the same for each Class member, and is the same across the Class.

369. DOSHIER's methodology to determine on a class-wide basis whether, and to what extent, DOSHIER and Class members have been charged for Engagements generated through fake Twitter accounts and whether and to what extent TWITTER has been unjustly enriched involves nothing more than what TWITTER should have been doing all

81

along. TWITTER should be made to deploy both an automated (i.e. computer algorithms) and a manual review of the TWITTER accounts which generated the Engagements, Ad Clicks, Follows, and Impressions, for the ads, or Promoted Tweets, for which each Class member was charged for by TWITTER. Thus, TWITTER will be able to determine whether the TWITTER accounts which generated the Engagements, Ad Clicks, Follows, and Impressions were generated through fake TWITTER accounts or not.

370. Based upon the fact that TWITTER detected and suspended 128 million fake accounts since they began doing so in the last quarter of 2017, it is evident that this methodology can be employed in this case.

371. TWITTER unequivocally has the ability to perform an automated review of the TWITTER accounts that generated Engagements that TWITTER charged DOSHIER and Class members for.

372. TWITTER unequivocally has the ability to perform an automated review as DOSHIER is requesting the court to order.

373. TWITTER unequivocally has the ability to perform a manual review of the TWITTER accounts that generated Engagements that TWITTER charged DOSHIER and Class members for.

374. TWITTER unequivocally has the ability to perform a manual review as DOSHIER is requesting the court to order.

375. TWITTER has a list of all of the Self-Serve Ad customers like DOSHIER.

376. All of TWITTER's Self-Serve Ad customers, like DOSHIER, will have the same type of Twitter analytics data as DOSHIER. This data will include the Handles of the TWITTER accounts that generated Engagements for every ad, or Promoted Tweet, that Self-Serve Ad customers purchased from TWITTER.

377. All of the Class members will have the same type of Twitter analytics data as DOSHIER.

378. TWITTER has, or should have, in its possession all of the analytics data for all of the Self-Serve Ads that DOSHIER and Class members have placed on TWITTER.

379. If TWITTER has failed to retain the analytics data, such as the Handles of the TWITTER accounts, which generated the Engagements, then TWITTER should be held liable for all of the Engagements.

380. If TWITTER has failed to retain the analytics data, such as the Handles of the TWITTER accounts, which generated the Impressions, then TWITTER should be held to have unjustly enriched itself.

381. If TWITTER has failed to retain the analytics data for the ads in which DOSHIER and Class members were charged by TWITTER, DOSHIER requests the court to assume that all of the TWITTER accounts which generated the Engagements, Ad Clicks, Follows, and Impressions, are fake TWITTER accounts until proven otherwise by TWITTER.

382. TWITTER should be liable for Engagements generated through TWITTER accounts that TWITTER can't prove are real.

383. TWITTER should not be allowed to profit at the expense of DOSHIER and Class members, by charging them for fake Engagements.

384. DOSHIER requests that the court order TWITTER to reimburse DOSHIER and Class members for every fake Impression.

385. TWITTER should not be allowed to be unjustly enriched at the expense of DOSHIER and Class members, by marketing their ads, or Promoted Tweets, to an audience that was tainted by fake TWITTER accounts.

386. TWITTER should be liable for Impressions generated those TWITTER accounts that TWITTER can't prove are real.

387. According to the article by Naked Security, "Fallen for a fake Twitter account? Here's how to spot them," dated February 16, 2017, "To get to a given account's true genesis, there's an easy way to search for its first tweet: just go to #FirstTweet and enter the account name."

388. The article by Naked Security, "Fallen for a fake Twitter account? Here's how to spot them," dated February 16, 2017, can be found at the following link:

https://nakedsecurity.sophos.com/2017/02/16/fallen-for-a-fake-twitter-account-heres-how-to-spot-them/

389. The "#FirstTweet" phrase in the abovementioned article, "Fallen for a fake Twitter account? Here's how to spot them," is a link to a Twitter page that is no longer available.

390. The #First Tweet link was as follows:

https://www.discover.twitter.com/first-tweet

391. The fact that the #FirstTweet link is no longer available on TWITTER is further evidence of TWITTER's self-serving policies, such as its data retention policies, that it has put in place to hide the fact that it has an extensive fake account problem for which it does not want to be held accountable.

392. Damages can be determined on a class-wide basis using this automated and manual review methodology to confirm DOSHIER and Class members have been charged for Engagements, such as Ad Clicks and Follows, generated through TWITTER accounts.

393. Damages can be determined on a class-wide basis using this automated and manual review methodology to confirm that TWITTER has been unjustly enriched by being able to inflate the pricing of its ad based upon fake Impressions generated though fake Twitter accounts.

394. The fact that TWITTER detected and suspended 128 million fake accounts since they began doing so in the last quarter of 2017 proves that they have systems in place to conduct this kind of review.

395. As the "bad actor" and sole repository of the data required to establish liability in this matter, TWITTER should be made to bear the cost of all actions associated with validating accounts in the manner described herein, including, but not limited to, manpower utilization and verification procedures, either automated or manual.

396. DOSHIER has filed this class action lawsuit, on behalf of himself and Class members, to ask the court to hold TWITTER accountable for the DIRECT damages that TWITTER has inflicted upon them for charging them for fake Engagements, as well as for the unjust enrichment of TWITTER as a result of TWITTER having created an artificial market or audience, and fake demand, for ads placed on TWITTER, through fake Impressions (i.e. Impressions generated through fake TWITTER

accounts) which has allowed TWITTER to profit at the expense of DOSHIER and Class members.

## **CLASS ACTION - ARCP 23**

397. Arkansas Rules Of Civil Procedure 23 provides that the prerequisites to a Class Action are: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

398. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

399. Pursuant to ARCP 23 Plaintiff, individually and on behalf of all others similarly situated, brings this lawsuit on behalf of themselves and as a class action on behalf of the following Class: All persons and/or entities within the United States who entered into Self-Service Advertising agreements with TWITTER, Inc. and who were subsequently charged by the Defendant for Engagements generated through fake TWITTER accounts.

400. The following persons and/or entities are excluded from the Class:

a. Persons and/or entities who timely opt-out of this proceeding using the correct protocol for opting-out that will be formally established by this court;

b. Any and all federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

c. Any currently sitting Arkansas state court judge and/or justice in the current style and/or any persons within the third degree of consanguinity to such judge and/or justice; and

d. Any person or entity who has filed a lawsuit against Defendants for overcharging for invalid clicks.

401. This court should find that a class action is maintainable because the requirements to ARCP 23 (a) are met by the class; that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

402. This matter should be certified as a class action by the Circuit Court of Faulkner County, Arkansas.

403. Plaintiffs should be awarded attorneys fees pursuant A.C.A. 4-88-113 (f) and A.C.A. 16-22-308.

404. All of the causes of action of the Plaintiffs herein occurred and are operative subsequent to February 18th, 2005. The causes of action herein are subsequent to the effective date of the Class Action Fairness Act (C.A.F.A.), Pub. L. No. 109-2.

405. Numerosity: The members of each Class are so numerous that joinder of all members of any Class would be impracticable. Plaintiff reasonably believes that Class members number in the 10s of millions of people or more in the aggregate. The names and addresses of Class members are identifiable through documents maintained by Defendants.

406. Commonality and Predominance: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

   a. Whether and to what extent TWITTER charged Plaintiff and Class members for Engagements that were generated though fake accounts;

b.  Whether and to what extent TWITTER was unjustly enriched by being able to inflate the pricing of its ads based upon fake Impressions generated though fake accounts.

c.  Whether Defendant's conduct violated the Deceptive Trade Practices Act {A.C.A. 4-88-107 (a ) (1)};

d.  Whether Defendant's conduct violated the Unfair Practices Act {A.C.A. 4-75-201 et seq};

e.  Whether Defendant violated Arkansas Common Law for Fraud and Deceit;

f.  Whether Defendant breached their advertising Contract with Plaintiff and Class members;

g.  Whether TWITTER misrepresented and continues to misrepresent the number of genuine accounts on the TWITTER platform;

h.  Whether Plaintiff and Class members' detrimentally relied upon Defendant's representations regarding the number of genuine accounts on the TWITTER platform;

i.  Whether TWITTER misrepresented and continues to misrepresent that ads, or Promoted Tweets will be marketed to real people with real TWITTER accounts, not to fake people with fake TWITTER accounts.

j.   Whether Plaintiff and Class members' detrimentally relied upon Defendant's representations that ads, or Promoted Tweets will be marketed to real people with real TWITTER accounts, not to fake people with fake TWITTER accounts.

k.   Whether TWITTER misrepresented and continues to misrepresent the number of genuine Impressions that ads, or Promoted Tweets will generate through genuine TWITTER accounts.

l.   Whether Plaintiff and Class members' detrimentally relied upon Defendant's representations as to the number of genuine Impressions that ads, or Promoted Tweets will generate through genuine TWITTER accounts;

m.   Whether TWITTER misrepresented and continues to misrepresent that ads, or Promoted Tweets, will result in genuine Engagements generated through genuine Twitter accounts, not fake Engagements generated through fake TWITTER accounts.

n.   Whether Plaintiff and Class members detrimentally relied upon Defendant's representations that ads, or Promoted Tweets, will result in genuine Engagements generated through genuine Twitter accounts, not fake Engagements generated through fake TWITTER accounts.

91

o. Whether TWITTER misrepresented and continues to misrepresent that ads, or Promoted Tweets that ads placed on their social network, or the TWITTER website would be marketed to real people;

p. Whether Plaintiff and Class members detrimentally relied upon Defendant's representations that ads placed on their social network, or the TWITTER website would be marketed to real people with genuine accounts;

q. Whether TWITTER knowingly made false representations and continues to make false representations about the number of genuine accounts, or real people on its social network, or TWITTER community;

r. Whether Plaintiff and Class members' detrimentally relied upon Defendant's representations about the number of genuine accounts, or real people on its social network, or TWITTER community;

s. Whether TWITTER knowingly made false representations and continues to make false representations that ads placed on its platform would be marketed to real people with genuine

TWITTER accounts on the social network, or TWITTER
community;

t. Whether Plaintiff and Class members' detrimentally relied upon
Defendant's representations that ads placed on its platform
would be marketed to real people with genuine TWITTER
accounts on the social network, or TWITTER community;

u. Whether Defendant was Unjustly Enriched at Plaintiff's and Class
members' expense;

v. Whether Plaintiff and the Class are entitled to equitable relief,
including, but not limited to, injunctive relief and restitution; and

w. Whether Plaintiff and the other Class members are entitled to
actual, statutory, or other forms of damages, and other monetary
relief.

407. Defendant engaged in a common course of conduct giving rise to the
legal rights sought to be enforced by Plaintiff individually and on behalf
of the members of the class. Similar or identical statutory and common
law violations, business practices, and injuries are involved. Individual
questions, if any, pale by comparison, in both quantity and quality, to
the numerous common questions that dominate this action.

408. Typicality: Plaintiff's claims are typical of the claims of the other members of their respective classes because, among other things, Plaintiff and the other class members were injured through the substantially uniform misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and hose of other Class members arise from the same operative facts and are based on the same legal theories.

409. Adequacy of Representation: Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation and Plaintiff will prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

410. Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other members of

their respective classes are relatively small compared to the burden and expense that would be require to litigate their claims on an individual basis against Defendant, making it impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

411. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b) of the Arkansas Rules of Civil Procedure.

412. Likewise, particular issues under Rule 23(b) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this

matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.  Whether and to what extent TWITTER charged Plaintiff and Class members for Engagements generated through fake TWITTER accounts;

b.  Whether (and when) TWITTER knew that fake TWITTER accounts were generating Engagements for ads, or Promoted Tweets, placed on its platform, or social network;

c.  Whether (and when) TWITTER knew that it had a substantial number of fake accounts that were generating Impressions for ads, or Promoted Tweets, placed on its platform, or social network;

d.  Whether (and when) TWITTER knew that its algorithms were failing to detect and prevent the creation of fake accounts on its platform, or social network;

e.  Whether (and when) TWITTER knew that its algorithms were failing to detect and suspend, or delete, fake accounts on its platform, or social network;

f.  Whether TWITTER knew (and when) that ads on its platform, or social network, were generating substantial revenue for the

company through Engagements generated through fake
TWITTER accounts;

g. Whether TWITTER failed to comply with its own policies or
applicable laws, regulations, and industry standards relating to
unfair and deceptive trade practices;

h. Whether TWITTER misrepresented and continues to misrepresent
the number of genuine accounts on the TWITTER platform;

i. Whether Plaintiff and Class members' detrimentally relied upon
Defendant's representations regarding the number of genuine
accounts on the TWITTER platform;

j. Whether TWITTER knowingly made false representations and
continues to make false representations about the number of
genuine accounts, or real people on the social network;

k. Whether TWITTER knowingly made false representations and
continues to make false representations that ads placed on the
social network would be marketed to genuine accounts, or real
people on the social network;

l. Whether TWITTER misrepresented and continues to misrepresent
that ads, or Promoted Tweets will be marketed to real people

with real TWITTER accounts, not to fake people with fake
TWITTER accounts.

m. Whether Plaintiff and Class members' detrimentally relied upon
Defendant's representations that ads, or Promoted Tweets will
be marketed to real people with real TWITTER accounts, not to
fake people with fake TWITTER accounts.

n. Whether TWITTER misrepresented and continues to misrepresent
the number of genuine Impressions that an ad, or Promoted
Tweets, will generate through genuine TWITTER accounts.

o. Whether Plaintiff and Class members' detrimentally relied upon
Defendant's representations as to the number of genuine
Impressions that an ad, or Promoted Tweets will generate
through genuine TWITTER accounts; and

p. Whether Defendant's acts, omissions, misrepresentations, and
practices were and are likely to deceive consumers.

413. Plaintiff and Class members allege and contend that they have suffered
damages.

## FIRST CLAIM FOR RELIEF

## Violations of the Deceptive Trade Practices Act {A.C.A. 4-88-107 (a ) (1)}

414. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

415. Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following:

   a. TWITTER misrepresented and continues to misrepresent the number of genuine accounts on the TWITTER platform;

   b. TWITTER misrepresented and continues to misrepresent the number of fake accounts on the TWITTER platform;

   c. TWITTER knowingly made false representations and continues to make false representations about the number of genuine accounts, or real people on its social network, or TWITTER community;

   d. TWITTER knowingly made false representations and continues to make false representations that ads placed on its platform would be marketed to real people with genuine TWITTER accounts, not to fake people with fake TWITTER accounts;

   e. TWITTER misrepresented and continues to misrepresent that an ad, or Promoted Tweet, will be marketed to real people with real

TWITTER accounts, not to fake people with fake TWITTER accounts.

f.     TWITTER misrepresented and continues to misrepresent the number of genuine Impressions that an ad, or Promoted Tweet, will generate through genuine TWITTER accounts.

g.     TWITTER misrepresented and continues to misrepresent that an ad, or Promoted Tweet, will result in genuine Engagements generated through genuine Twitter accounts, not fake Engagements generated through fake TWITTER accounts.

416.  TWITTER charged Plaintiff and Class members for Engagements generated through fake TWITTER accounts.

417.  TWITTER has been unjustly enriched by marketing ads, or Promoted Tweets, to fake TWITTER accounts, which result in fake Impressions, which allow, and have allowed TWITTER to profit at the expense of DOSHIER and Class members, as TWITTER has created an artificial market or audience, or fake demand for ads, or Promoted Tweets, placed on its platform, and thus has been able to artificially inflate the pricing for its advertising.

## **SECOND CLAIM FOR RELIEF**

## **Violations of the Unfair Practices Act {A.C.A. 4-75-201 et seq}**

418. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

419. The purpose (A.C.A. 4-75-202) of the Unfair Practices Act is set out as follows: The General Assembly declares that the purpose of this subchapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented.

420. TWITTER is an unregulated monopolistic behemoth in the social network space.

## THIRD CLAIM FOR RELIEF

### Violations of Arkansas Common Law for Fraud and Deceit

421. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

422. This is a claim for damages based upon deceit in accordance with the requirements of AMI 402 and the Plaintiff and Class members contend that they have sustained damages, that there was a false representation of a material fact made by TWITTER, that TWITTER either knew that the representation was false or that TWITTER did not have a sufficient basis of information to make the representation, that

101

TWITTER intended to induce the Plaintiff and Class members to act or refrain from acting in reliance upon the misrepresentation, and that the Plaintiff and Class members justifiably relied upon the representation in acting or refrain from acting and as a result sustained damages.

## FOURTH CLAIM FOR RELIEF CONTRACT LAW

423. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

424. This is a claim of breach of contract on the part of TWITTER.

425. Plaintiff and Class members contend that there was an agreement and that the Plaintiff and Class members relied upon the agreement and there were definite terms for the agreement and as a result of the breach of the agreement by TWITTER the Plaintiff and Class members have suffered damages.

426. It is on the representations by TWITTER on their website that Plaintiffs rely for their claim that TWITTER has a uniform contract for Self-Serve Advertisers regarding Engagements and Impressions and Promoted Tweets, which said contract specifically states, Self-Serve Advertisers "Only pay when [REAL] users follow your account or retweet, like, reply, or click on your Promoted Tweet," or to say it another way, Self-Serve Advertisers "Only pay for real Engagements."

427. Plaintiff contracted with TWITTER to pay TWITTER to Promote Tweets to real people with genuine TWITTER accounts, not fake people with fake TWITTER accounts.

428. TWITTER, however, systematically failed to limit charges to Engagements generated through genuine TWITTER accounts. Instead, Self-Serve Advertisers have been and continue to be unlawfully charged for and presently pay for Engagements generated through fake TWITTER accounts.

429. TWITTER has consistently represented on its website that it markets Promoted Tweets to real people, resulting in genuine Impressions generated through genuine TWITTER accounts.

430. TWITTER has consistently represented on its website that it charges Self-Serve Advertisers only for Engagements generated through genuine TWITTER accounts.

431. Self-Serve Advertisers have been and continue to be unlawfully charged for and presently pay for fake Engagements.

432. TWITTER breached its contract with Plaintiff and Class members as it has charged them for fake Engagements.

## FIFTH CLAIM FOR RELIEF PROMISSORY ESTOPPEL

433. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

434. This is a claim of promissory estoppel.

435. TWITTER knowingly made false representations and continues to make false representations, including but not limited to the following:

    a.    TWITTER misrepresented and continues to misrepresent the number of genuine accounts on the TWITTER platform;

    b.    Plaintiff and Class members' detrimentally relied upon Defendant's representations regarding the number of genuine accounts on the TWITTER platform;

    c.    TWITTER misrepresented and continues to misrepresent that ads, or Promoted Tweets will be marketed to real people with real TWITTER accounts, not to fake people with fake TWITTER accounts.

    d.    Plaintiff and Class members' detrimentally relied upon Defendant's representations that ads, or Promoted Tweets will be marketed to real people with real TWITTER accounts, not to fake people with fake TWITTER accounts.

e.    TWITTER misrepresented and continues to misrepresent the number of genuine Impressions that ads, or Promoted Tweets will generate through genuine TWITTER accounts.

f.    Plaintiff and Class members' detrimentally relied upon Defendant's representations as to the number of genuine Impressions that ads, or Promoted Tweets will generate through genuine TWITTER accounts;

g.    TWITTER misrepresented and continues to misrepresent that ads, or Promoted Tweets, will result in genuine Engagements generated through genuine Twitter accounts, not fake Engagements generated through fake TWITTER accounts.

h.    Plaintiff and Class members detrimentally relied upon Defendant's representations that ads, or Promoted Tweets, will result in genuine Engagements generated through genuine Twitter accounts, not fake Engagements generated through fake TWITTER accounts.

i.    TWITTER misrepresented and continues to misrepresent that ads, or Promoted Tweets that ads placed on their social network, or the TWITTER website would be marketed to real people;

j.     Plaintiff and Class members detrimentally relied upon Defendant's representations that ads placed on their social network, or the TWITTER website would be marketed to real people with genuine accounts;

k.     TWITTER knowingly made false representations and continues to make false representations about the number of genuine accounts, or real people on its social network, or TWITTER community;

l.     Plaintiff and Class members' detrimentally relied upon Defendant's representations about the number of genuine accounts, or real people on its social network, or TWITTER community;

m.     TWITTER knowingly made false representations and continues to make false representations that ads placed on its platform would be marketed to real people with genuine TWITTER accounts on the social network, or TWITTER community;

n.     Plaintiff and Class members' detrimentally relied upon Defendant's representations that ads placed on its platform would be marketed to real people with genuine TWITTER accounts on the social network, or TWITTER community;

o.  Defendant was Unjustly Enriched at Plaintiff's and Class members' expense;

p.  Plaintiff and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution; and

q.  Plaintiff and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

436. TWITTER charged Plaintiff and Class members for fake Engagements.

437. TWITTER has been unjustly enriched by marketing ads, or Promoted Tweets, to fake TWITTER accounts, which result in fake Impressions, which allow, and have allowed TWITTER to profit at the expense of DOSHIER and Class members, as TWITTER has created an artificial market or audience, or fake demand for ads, or Promoted Tweets, placed on its platform, and thus has been able to artificially inflate the pricing for its advertising.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

438. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein.

439. TWITTER has been, and will continue to be unjustly enriched at the expense of Plaintiff and Class members.

440. TWITTER has been unjustly enriched by marketing ads, or Promoted Tweets, to fake TWITTER accounts, which result in fake Impressions, which allow, and have allowed TWITTER to profit at the expense of DOSHIER and Class members, as TWITTER has created an artificial market or audience, or fake demand for ads, or Promoted Tweets, placed on its platform, and thus has been able to artificially inflate the pricing for its advertising.

441. TWITTER has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers who purchased ads, based upon misrepresentations by TWITTER, including but not limited to the following misrepresentations:

    a.     TWITTER has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers who purchased ads, based upon misrepresentations by TWITTER that the ads would be marketed to real people with genuine TWITTER accounts on the social network, not fake people with fake TWITTER accounts

    b.     Plaintiff and Class members' detrimentally relied upon Defendant's representations that their ads would be marketed to real people with genuine accounts on the social network, not fake people with fake TWITTER accounts.

c.   TWITTER has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers to which defendant is not entitled because of its misrepresentation as to the amount of real people with genuine accounts on the social network.

d.   Plaintiff and Class members' detrimentally relied upon Defendant's representations about to the amount of real people with genuine accounts on the social network.

e.   TWITTER has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers to which defendant is not entitled because of its misrepresentation as to the number of genuine Engagements they could expect their ads, or Promoted Tweets, to generate.

f.   Plaintiff and Class members' detrimentally relied upon Defendant's representations as to the number of genuine Engagements they could expect their ads, or Promoted Tweets, to generate.

g.   TWITTER has been unjustly enriched by their receipt of monies received from Self-Serve Advertisers to which defendant is not entitled because of its misrepresentation as to the number of

genuine Impressions they could expect their ads, or Promoted
Tweets, to generate.

h.  Plaintiff and Class members' detrimentally relied upon
Defendant's representations as to the number of genuine
Impressions they could expect their ads, or Promoted Tweets, to
generate.

i.  Plaintiff and Class members' detrimentally relied upon
Defendant's representations as to the number of genuine
Engagements they could expect their ads, or Promoted Tweets,
to generate.

j.  Plaintiff and Class members' detrimentally relied upon
Defendant's representations that they would only be charged for
Engagements generated by real people with real TWITTER
accounts.

k.  TWITTER misrepresented and continues to misrepresent that an
ad, or Promoted Tweet, placed on its platform, or social
network, would be marketed to real people with real TWITTER
accounts, not fake people with fake Twitter accounts.

l.  Plaintiff and Class members' detrimentally relied upon
Defendant's representations that an ad, or Promoted Tweet,

110

placed on its platform, or social network, would be marketed to

real people, not fake people with fake Twitter accounts.

442. TWITTER charged Plaintiff and Class members for fake Engagements.

443. TWITTER has been unjustly enriched by marketing ads, or Promoted

Tweets, to fake TWITTER accounts, which result in fake Impressions,

which allow, and have allowed TWITTER to profit at the expense of

DOSHIER and Class members, as TWITTER has created an artificial

market or audience, or fake demand for ads, or Promoted Tweets,

placed on its platform, and thus has been able to artificially inflate the

pricing for its advertising.

### SEVENTH CLAIM FOR RELIEF

444. Fixing Prices or Quantities of Products {A.C.A. Sec. 4-75-309}

445. The preceding paragraphs of this Complaint are realleged and

incorporated by reference as if fully set forth herein.

446. 319. A.C.A. Sec. 4-75-309 states, in pertinent part:

Any corporation organized under the laws of this or any other state or

country and transacting or conducting any kind of business in this

state, or any partnership or individual, or other association or persons

whatsoever, who is, or creates, enters into, or becomes a member of,

or a party to, any pool, trust, agreement, combination, confederation,

111

or understanding, whether it is made in this state or elsewhere, with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix, either in this state or elsewhere, the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning, or tornado, or to maintain the price when so regulated or fixed, or who is, or enters into, or becomes a member of, or a party to any pool, agreement, contract, combination, association, or confederation, whether made in this state or elsewhere, to fix or limit in this state or elsewhere, the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning, storm, cyclone, or tornado or any other kind of policy issued by any corporation, partnership, individual, or association of persons aforesaid, shall be deemed and adjudged guilty of a conspiracy to defraud and be subject to the penalties as provided by this subchapter.

447. TWITTER transacts business in the State of Arkansas.

448. By misrepresenting the number of genuine accounts on its platform, or social network, TWITTER is able to charge more for the ads that are placed by consumers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

449. By misrepresenting the number of genuine Impressions that an ad, or Promoted Tweet, can be expected to generate, TWITTER is able to charge more for the ads that are placed by consumers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

450. By misrepresenting the number of genuine Engagements that an ad, or Promoted Tweet, can be expected to generate, TWITTER is able to charge more for the ads that are placed by consumers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

451. By failing to have adequate policies and procedures in place to detect and prevent the creation of fake accounts on its platform TWITTER is able to charge more for the ads that are placed by Self-Serve

Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

452. By misrepresenting that ads placed on its platform, or social network, are marketed to real people with real TWITTER accounts, when in fact they are also marketed to fake people with fake TWITTER accounts, TWITTER is able to charge more for the ads that are placed by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

453. By misrepresenting that TWITTER is a social network of real people that interact and communicate with each other through Tweets, TWITTER is able to charge more for the ads that are placed by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

454. By misrepresenting that advertising on TWITTER will help you "Reach [REAL] potential customers" and "Get your messages in front of [REAL] people not yet following you by promoting your Tweets," when in fact Promoted Tweets are marketed to fake people with fake accounts, TWITTER is able to charge more for the ads that are placed

by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

455. By misrepresenting that advertising on TWITTER will help you "Gain more [REAL] followers" when in fact Promoted Tweets are also marketed to fake people with fake accounts, which generate fake Follows, TWITTER is able to charge more for the ads that are placed by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

456. By misrepresenting that advertising on TWITTER will help you "Get your messages in front of people [REAL IMPRESSIONS] not yet following you by promoting your Tweets," when in fact Promoted Tweets are also marketed to fake people with fake accounts, which generate fake Impressions, TWITTER is able to charge more for the ads that are placed by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

457. By misrepresenting that advertising on TWITTER will allow you to "Amplify your message and get discovered [BY REAL PEOPLE]" as well

as help you to "Get your Tweets and your account in front of more [REAL] people who are interested in you," when in fact Promoted Tweets are also marketed to fake people with fake accounts, which can generate fake Follows, TWITTER is able to charge more for the ads that are placed by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

458. By misrepresenting that Self-Serve Advertisers "Only pay when [REAL] users follow your account or retweet, like, reply, or click on your Promoted," TWITTER is able to charge more for the ads that are placed by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

459. By misrepresenting that Self-Serve Advertisers only pay for real Engagements, when in fact they are charged for fake Engagements as well, TWITTER is able to charge more for the ads that are placed by Self-Serve Advertisers on the TWITTER website. This is part of a coordinated multi-departmental effort by TWITTER to fix the pricing of their ads.

460. Through the generation of fake traffic from fake accounts, TWITTER fixes the prices of its ads.

461. Through the creation of an artificially inflated market or audience, i.e. fake Impressions, TWITTER fixes the prices of its ads.

462. Through the generation of fake demand from fake accounts, i.e. fake Impressions TWITTER fixes the prices of its ads.

463. TWITTER has been unjustly enriched by marketing ads, or Promoted Tweets, to fake TWITTER accounts, which result in fake Impressions, which allow, and have allowed TWITTER to profit at the expense of DOSHIER and Class members, as TWITTER has created an artificial market or audience, or fake demand for ads, or Promoted Tweets, placed on its platform, and thus has been able to artificially inflate the pricing for its advertising.

### PRAYER FOR RELIEF

464. WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that this Court enter an Order:

    a.    Certifying the United States Class and appointing Plaintiff as Class Representative;

    b.    Finding that Defendants' conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

c.  Enjoining Defendants from engaging in further negligent, deceptive, unfair, and unlawful business practices alleged herein;

d.  Awarding Plaintiff and the Class members nominal, actual, compensatory, and consequential damages;

e.  Awarding Plaintiff and the Class members statutory damages and penalties, as allowed by law;

f.  Awarding Plaintiff and the Class members restitution and disgorgement;

g.  Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

h.  Awarding Plaintiff and Class members punitive damages because of the unconscionable, unfair, unjust, and arrogant actions of TWITTER;

i.  Awarding Plaintiff and the Class members treble damages, similar to those awarded under the False Claims Act, as TWITTER has knowingly submitted false claims for payment to the Plaintiff and Class members;

j.  Awarding DOSHIER, as lead plaintiff, a share of the recovery as an incentive payment, similar to that awarded to a whistle blower plaintiff under the False Claims Act;

k.  Awarding Plaintiff and the Class members "reasonable attorneys'

   fees," costs and expenses, and;

l.  Granting such other relief as the Court deems just and proper

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all claims.

**WILLIAM F. DOSHIER, Plaintiff**

**By:**  **/s/ David A. Hodges** _____

**DAVID A. HODGES**
**Attorney at Law**
**Centre Place**
**212 Center Street, Fifth Floor**
**Little Rock, Arkansas 72201-2429**
**Arkansas Bar No. 65021**
**Telephone:(501) 374-2400**
**Facsimile:(501) 374-8926**
**E-Mail:david@hodgeslaw.com**
**Web: www.hodgeslaw.com**

119