IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOTSTRATEGY CO,<br><br>    Plaintiff,<br><br>    v.<br><br>TWITTER INC.,<br><br>    Defendant. | Case No. 19-cv-06176-CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |

Twitter, Inc., promises advertisers on its platform that they will only be charged when "people" interact with the accounts or Tweets they are paying to promote. DotStrategy, Co., believes it was charged for interactions with automated accounts ("bots") and that Twitter failed to refund it for those interactions even after it learned that the bot accounts were not, in fact, controlled by "people." DotStrategy has sued Twitter under California's Unfair Competition Law. Twitter moves to dismiss. The motion is denied as to dotStrategy's allegations based on interactions with bots. The First Amended Complaint adequately alleges that dotStrategy suffered economic injury as a result of its reliance on Twitter's false representation that advertisers would only be charged for interactions with "people." However, dotStrategy has not adequately alleged that it was wrongfully charged for interactions with "fake" accounts that were nonetheless controlled by people. Twitter's motion is granted as to those allegations.

**I.     BACKGROUND**

"Twitter is a social networking and microblogging service, enabling registered users to read and post short messages called Tweets." FAC (dkt. 58) ¶ 1. Twitter does not make money by charging users for access to the platform. Id. ¶ 4. Instead, it sells advertising. Id. Advertisers pay to promote their Tweets or Twitter accounts. Id. ¶ 7.

Twitter charges advertisers based on how many times users interact with the promoted account or content. Id. ¶ 8. At various times it has represented that advertisers pay only for interactions with "people." Id. For example, in 2013, Twitter represented to advertisers that they would "only be charged when people follow your Promoted Account or retweet, reply, favorite or click on your Promoted Tweets." Id. ¶ 37(c). Similarly, in 2014, Twitter claimed that advertisers would "[p]ay only when people follow[ed] [their] account." Id. ¶ 38(c).

DotStrategy is a marketing company which has advertised its services on Twitter. Id. ¶ 21. Between October 2013 and December 2016, dotStrategy placed thirty-four ads on Twitter for which it paid a total of $2,220.76. Id. ¶ 36. DotStrategy alleges that when it placed its ads, it reviewed and relied on Twitter's representations that advertisers would only be charged for interactions with "people." Id. ¶¶ 39, 75.

When it first began advertising with Twitter, dotStrategy agreed to the Twitter Advertising Terms. Huffman Decl. (dkt. 67) ¶ 3.[1] The Advertising Terms include two provisions relevant here. First, they state that Twitter "[t]o the fullest extent permitted by law . . . disclaim[s] all guarantees regarding . . . quality . . . of . . . any User Actions . . . ." Huffman Decl. Ex. B (dkt. 67-2) ¶ 9. Second, they explain that "[c]harges are solely based on [Twitter's] measurements for the Program." Huffman Decl. Ex. B ¶ 11.

A large number of accounts on Twitter are primarily controlled by bots rather than human beings. FAC ¶ 9. In July 2018, Twitter deleted 70 million accounts "it had deemed spammy, inactive, or which were displaying 'erratic' behavior that indicated they were likely bots." Id. ¶ 49

---

[1] DotStrategy does not oppose Twitter's request for judicial notice of the Advertising Terms, and Twitter correctly notes that the FAC incorporates the Advertising Terms by reference because it implicates the parties' rights and duties under that document. See Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010). Twitter's request for judicial notice of the Advertising Terms is therefore granted. See RJN (dkt. 68). The other documents Twitter requests notice of are either "not subject to reasonable dispute" because their veracity "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned[,]" see Fed. R. Evid. 201(b), (b)(2); see also Moore v. Apple, Inc., 73 F. Supp. 3d 1191, 1197 & n.1 (N.D. Cal. 2014) (materials available online subject to judicial notice); Erickson v. Neb. Mach. Co., No. 15–cv–1147–JD, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015) (materials available on the Wayback Machine subject to judicial notice), or incorporated by reference because they are quoted in or implicated by the FAC, see Coto, 593 F.3d at 1038; Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (documents quoted in complaint incorporated by reference). Twitter's request for judicial notice is therefore granted in its entirety.

(quoting another source). Around the same time, 480 of dotStrategy's Twitter followers were deleted. Id. ¶ 50. After a Twitter account has been deleted, it is "as if the account never existed," making it difficult or impossible to find information about the account. Id. ¶ 51 (quoting another source).

DotStrategy believes that Twitter wrongfully charged it for interactions with "fake accounts that often [took] the form of an automated bot." Id. ¶¶ 16–18. It has brought suit claiming that Twitter's misrepresentations violated the UCL. Id. ¶¶ 72–87. Twitter moves to dismiss. See Mot. (dkt. 65).

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019). A complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances

1    constituting fraud or mistake."[2]  Rule 9(b) "requires . . . an account of the time, place, and specific

2    content of the false representations as well as the identities of the parties to the

3    misrepresentations."  Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation

4    marks omitted).

5          If a court does dismiss a complaint for failure to state a claim, it should "freely give leave

6    [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court nevertheless has

7    discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of

8    the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

9    prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of

10   amendment."  Leadsinger, Inc. v. BMG Music Publ'g., 512 F.3d 522, 532 (9th Cir. 2008)

11   (alteration in original) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

12   **III.   DISCUSSION**

13         Twitter advances four arguments for dismissal.  First, it argues that dotStrategy has not

14   alleged false statements or misrepresentations with the specificity required by Rule 9(b).  Mot.

15   at 9–13.  Second, it argues that dotStrategy has failed to adequately plead reliance on any

16   ostensible misstatements.  Id. at 14–17.  Third, it contends that dotStrategy's claims are precluded

17   by disclaimers in the Advertising Terms.  Id. at 13–14.  Fourth, it argues that dotStrategy has

18   failed to establish UCL standing.  Id. at 17–18.

19       **A.   False Statements**

20         Twitter complains that the FAC fails to satisfy Rule 9(b) because dotStrategy alleges that

21   Twitter wrongfully charges for "fake," "false," or "spam" accounts without adequately defining

22   those terms.  Id. at 10–13.  Twitter is correct.  DotStrategy clearly considers "bot" accounts (i.e.,

23   those controlled entirely or primarily by a computer program rather than a human being) to be

24   fake.  See FAC ¶ 17.  But, as Twitter points out, and as counsel for dotStrategy confirmed during

25   oral argument, the FAC also alleges that a broader category of human-controlled Twitter accounts

26   are fake, without identifying the outer boundaries of this group.  See, e.g., id. ¶ 63 (stating that

27

28   ───────────────
   [2] DotStrategy does not contest that Rule 9(b) applies to its UCL claim, which sounds in fraud.

"fake Twitter Accounts . . . include[e] but [are] not limited to automated bots."). Although the FAC includes some vague suggestions about what makes a human-controlled account fake, see, e.g., id. ¶¶ 17, 74, 76, 80, its allegations are insufficient to put Twitter on notice as to which of its statements were ostensibly false.

DotStrategy responds that the terms "fake," "false," and "spam" cannot be insufficiently precise, because Twitter itself has used those words to describe activity forbidden on its platform. Opp'n (dkt. 70) at 5–6. This argument fails. The Twitter communications dotStrategy cites may state that "fake" or "spam" accounts are not allowed, see id., but because they do not explain what those terms mean, they do nothing to help satisfy Rule 9(b). DotStrategy suggests its lack of precision should be excused because what makes an account "fake," "false," or "spam" in Twitter's eyes is a "matter[ ] within the opposing party's knowledge." Opp'n at 7 (quoting Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989)). But the fact that Twitter knows what it means when it uses these terms does not excuse dotStrategy's obligation to identify the categories of interactions it was wrongfully charged for.

Any theory of liability premised on interactions with human-controlled accounts fails for the additional reason that the FAC identifies no statement promising that Twitter advertisers would not be charged for interactions with "fake" accounts that were controlled by people. The only alleged misstatements that could possibly be construed as making such a promise are general proclamations about the benefits of advertising with Twitter. See, e.g., FAC ¶¶ 27, 38 (promising that advertising on Twitter can "build an engaged audience to amplify your message" and "an active community of advocates and influencers for your business"). Even assuming these claims are more than non-actionable puffery, but see Reply (dkt. 71) at 9–10, they could not reasonably be construed as a promise that advertisers would not be charged for engagements with human-controlled accounts. A reasonable advertiser would understand that achieving its goals might require some interaction with Twitter users who use the platform to disseminate spam, violate Twitter's terms of service, or otherwise qualify as "fake" despite being human. This is especially true because according to dotStrategy's own allegations, Twitter is rife with such users. See FAC ¶ 53.

5

Finally, at oral argument, dotStrategy's counsel suggested that a reasonable advertiser would understand the word "people" to mean people who abide by Twitter's rules. The Court rejects this argument. It is aware of no definition of personhood that is contingent on abiding by a corporation's terms of service.

However, dotStrategy adequately alleges that Twitter falsely represented that advertisers would not be charged for interactions with bots. The FAC identifies numerous statements to the effect that advertisers would only be charged for interactions with "people." See, e.g., FAC ¶ 37(c) ("You'll only be charged when people follow your Promoted Account or retweet, reply, favorite or click on your Promoted Tweets."). A reasonable advertiser would understand these statements to mean that they would not be charged—or would be offered a refund—for interactions Twitter knew involved an automated account. Unsurprisingly, Twitter concedes that "these statements could be interpreted as a promise that Twitter will not charge for known bot-engagement." Mot. at 17.

And contrary to Twitter's position, see Reply at 1, the FAC adequately alleges that dotStrategy was charged and has not been refunded for interactions with bot accounts. In particular, it alleges that dotStrategy's @buzznnames Twitter account lost 480 (roughly 17%) of its followers in the twenty-eight days preceding July 20, 2018. FAC ¶ 50. The FAC further alleges that Twitter embarked on a campaign to purge its platform of bots during the same time period, leading to the deletion of 70 million accounts, id. ¶ 49, and that a large number of automated accounts are active on Twitter, id. ¶¶ 9, 56(a). Taken together, those facts plausibly allege that at least some of the 480 deleted accounts must have been bots, that dotStrategy most likely paid for interactions with some of those bots, and that Twitter failed to reimburse the money paid for those interactions despite knowing they involved automated accounts. See id. ¶¶ 21, 48, 52.

True, dotStrategy has not identified what interactions with the 480 deleted accounts it was charged for or which deleted accounts were bots. But that imprecision must be excused because the information that could fill the gap is a "matter[ ] within the opposing party's knowledge." Moore, 885 F.2d at 540. As the FAC explains, "when an account is deleted, Twitter does not

6

provide data about the account after the deletion date.  It is as if the account never existed."[3]  FAC ¶ 51 (quoting another source).  Because only Twitter has access to the data that would allow dotStrategy to identify the bot accounts it was wrongfully charged for, the FAC's failure to identify those accounts with particularity is not dispositive.  See Rubenstein v. Neiman Marcus Grp. LLC, 687 F. App'x 564, 568 (9th Cir. 2017).  Even Twitter agrees that dotStrategy need not "identify each account for which it believes it was improperly charged, and the precise date and time . . . it was improperly charged for an advertising interaction by that account."  Reply at 5–6 (emphasis in original).

Twitter's motion to dismiss is granted as to dotStrategy's allegations that it was wrongfully charged for interactions with "fake" accounts controlled by humans.  But it is denied with respect to allegations that dotStrategy was wrongfully charged for accounts controlled by bots.  The rest of this Order therefore addresses Twitter's other arguments only as applied to the latter theory of liability.

### B.     Reliance

Twitter asserts that dotStrategy fails to adequately allege reliance on the misrepresentations regarding interactions with automated accounts.  Mot. at 14–17.  But the FAC identifies specific false representations made by Twitter, see FAC ¶¶ 37–38, and alleges both that "[o]n or about October 9, 2013, through December 3, 2016, Plaintiff reviewed various representations by Twitter on its Promoted Products, including the representations identified [earlier in the FAC,]" id. ¶ 39, and that it "relied" on those representations, id. ¶ 75.  As dotStrategy correctly notes, this Court has held virtually identical allegations adequate to allege reliance on false advertising in a case involving UCL claims.[4]  See Bronson v. Johnson & Johnson, Inc., No. C 12–04184 CRB, 2013 WL 5731817, at *6 (N.D. Cal. Oct. 22, 2013) (holding allegations that purchasers relied on a

---

[3] It makes no difference if dotStrategy could have accessed some of this information at some point before filing the instant suit.  DotStrategy could not have known that it would need access to this information for litigation before it became aware that it had been wrongfully charged for interactions with automated accounts.

[4] Twitter argues Bronson is distinguishable because dotStrategy does not allege it relied on the alleged false statements.  Reply at 7 n.2.  But that is incorrect, dotStrategy does allege it relied on Twitter's misrepresentations.  See FAC ¶ 75.

website or packaging that displayed "specific [false] representations" adequate to satisfy Rule 9(b), even though the complaint did "not allege the specific date" when the consumers reviewed the misrepresentations). Other decisions in this district have also held reliance adequately pled when plaintiffs alleged that they reviewed and relied upon specific misrepresentations during a comparable span of time.[5] See, e.g., Bruton v. Gerber Prods. Co., No. 12–CV–02412–LHK, 2014 WL 172111, at *3, *13 (N.D. Cal. Jan. 15, 2014).

Twitter makes much of the fact that dotStrategy agreed to the Advertising Terms in October 2013. Reply at 6–7. Twitter contends that this renders any misrepresentations it made after October 2013 irrelevant. Id. That argument fails for two reasons. First, the FAC alleges that Twitter misrepresented in 2013 that advertisers would not be charged for interactions with bots, FAC ¶ 37(c), so even if statements made after that point are irrelevant, dotStrategy would still adequately allege reliance. Second, the FAC alleges that dotStrategy continued to place ads, thereby incurring additional charges, after October 2013. FAC ¶ 36. Misrepresentations after that date are relevant because dotStrategy could have relied on them in deciding to place additional ads at additional cost. Cases involving misrepresentations made after the plaintiff's purchase was complete are distinguishable.

Finally, to the extent Twitter argues dotStrategy's reliance was unreasonable, that argument fails for the reasons explained above. A reasonable consumer would understand statements such as "You'll only be charged when people follow your Promoted Account or retweet, reply, favorite or click on your Promoted Tweets" to mean that Twitter would refund charges for those interactions if it later learned they involved a bot. See FAC ¶ 37(c).

### C.    Contractual Disclaimers

Twitter argues that dotStrategy's suit is precluded by two disclaimers from the Advertising Terms: that "[Twitter] disclaim[s] all guarantees regarding [the] . . . quality . . . of . . . any User Actions" and that "Charges are solely based on our measurements for the Program."[6] Mot. at 13

---

[5] Twitter contends these cases are distinguishable because they involve food labeling but does not explain why that factual distinction is legally relevant. See Reply at 7 n.2.

[6] The Advertising Terms also state that an advertiser's "exclusive remedy, and our exclusive liability, for suspected Invalid User Actions, is to make a claim for a refund in the form of

(internal citations omitted, internal alterations and emphasis in original).

As an initial matter, Twitter's suggestion that extra-contractual misrepresentations can never give rise to a UCL claim when corrected by contractual disclaimers is false. See Reply at 11–12. The Ninth Circuit has recognized that a UCL fraud claim can be based on misleading representations in a solicitation even when the plaintiff later signed a contract with provisions contradicting the earlier falsehoods. See Rubio v. Capital One Bank, 613 F.3d 1195, 1204–06 (9th Cir. 2010). As a result, a plaintiff may state a claim for fraud under the UCL while failing to plead a breach of contract claim. See id. Contrary to Twitter's reading of the case, Reply at 11 n.6, Rubio involved a fraud claim under the UCL, not just truth-in-lending laws, see 613 F.3d at 1204, and has been extended to facts virtually identical to those presented here by courts in the Northern District of California, see In re Facebook PPC Advert. Litig., No. 5:09–cv–03043–JF, 2010 WL 5174021, at *7–10 (N.D. Cal. Dec. 15, 2010). The question, then, is not whether Twitter's contractual terms corrected the false statements in its advertising, but whether dotStrategy's reliance on the false advertising was reasonable even in light of the contractual disclaimers. See id. at *9.

DotStrategy's reliance on Twitter's misstatements was reasonable despite the contractual disclaimers because the contractual provisions Twitter relies on are not irreconcilable with dotStrategy's understanding that it would not be charged for interactions with bots. Disclaiming the "quality" of "User Actions" is not a clear warning that those users might not be people. See Mot. at 13. A reasonable advertiser could understand the disclaimer to refer to other aspects of user interactions, such as whether users would retweet promoted content with positive rather than negative messaging. That understanding would be particularly reasonable given Twitter's other representations guaranteeing that advertisers would not pay for interactions with automated accounts. See FAC ¶ 37(c). Similarly, that Twitter has discretion to determine charges for

---

Promoted Products credits within the time period required under Section 11 below." Mot. at 13. The "time period required" is sixty days from the date of the charge. Reply at 12 n.8. Because Twitter does not argue that dotStrategy's claims must be referred to this internal arbitration process, and explicitly disclaims reliance on the sixty-day limitations period, see id., it is unnecessary to decide whether this provision is enforceable under California law.

9

1  advertising does not mean it can charge for interactions with automated accounts when it explicitly
2  promised not to do so elsewhere.  An advertiser could reasonably believe that Twitter would
3  determine the amount of advertising charges in a manner consistent with its other representations.
4  In short, Twitter cannot rely on ambiguous disclaimers to correct unambiguous
5  misrepresentations.

### D. UCL Standing

A private plaintiff only has standing to bring a UCL claim if it "has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Standing under the UCL is therefore limited to plaintiffs who have suffered economic harm, rendering it meaningfully narrower than Article III standing. Kwikset Corp. v. Superior Court, 246 P.3d 877, 886 (Cal. 2011).

Twitter advances three arguments that dotStrategy has failed to meet this standard. Two are redundant of arguments considered above. First, Twitter argues that "because the FAC does not adequately explain what Twitter's alleged unlawful activity is, . . . it fails to establish that Plaintiff paid money 'as a result of' any unlawful activity." Mot. at 17 (emphasis in original). This argument fails because, as explained above, dotStrategy has adequately alleged that Twitter falsely represented that advertisers would only be charged for interactions with people. Second, Twitter argues that because dotStrategy "does not identify which alleged misrepresentations it relied on" it has failed "to establish the 'causal connection' UCL requires." Mot. at 18 (emphasis in original).  This argument fails because dotStrategy has adequately pled reliance.

That leaves only Twitter's contention that dotStrategy has not demonstrated economic injury. See Mot. at 17–18.  DotStrategy alleges that it "paid for ads for which it would not have agreed to pay anything at all had it known the truth about Twitter's misconduct." FAC ¶ 77.  That is sufficient to allege economic injury. See Kwikset Corp., 246 P.3d at 892 (plaintiffs who purchased lockets falsely labeled "Made in U.S.A." suffered economic injury because they would not have bought the lockets had they known the truth).

Twitter argues that dotStrategy received the benefit of its bargain because it gained more Twitter followers.  Mot at 18; Reply at 13–14.  The Court rejects this theory's underlying

assumption that "a public[ly] visible increase in . . . follower count" is the only goal an advertiser might have in promoting its products on Twitter. See Mot. at 18. Presumably human followers are more valuable to advertisers than automated ones, because humans, unlike bots, sometimes purchase goods and services. If anything, that difference seems more meaningful than, for example, a product's domestic origin. See Kwikset Corp., 246 P.3d at 892.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: August 3, 2020



CHARLES R. BREYER
United States District Judge